ISABELLE RICCIO, AS GENERAL ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF DONNA E. RICCIO, AN INFANT, DECEASED, AND ISABELLE RICCIO, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. PRUDENTIAL PROPERTY & CASUALTY INSURANCE COMPANY, DEFENDANT-RESPONDENT.

Argued October 7, 1985—Decided September 30, 1987.

*Maurice H. Connelly* argued the cause for appellants (*Guarini & Guarini,* attorneys).

*Francis X. Garrity* argued the cause for respondent (*De-Gonge, Garrity & Fitzpatrick,* attorneys).

PER CURIAM.

On plaintiff's petition we granted certification, 99 *N.J.* 221 (1985), to review the Appellate Division's affirmance of a judgment awarding plaintiff $4500 against defendant, Prudential Property & Casualty Insurance Company (Prudential), under the uninsured motorist (UM) provisions of its policy covering plaintiff's automobile. Plaintiff's claim for UM benefits went to arbitration. The arbitrator found liability on the part of the "phantom" uninsured motorist, and calculated plaintiff's damages. The trial court applied against that damage award a *pro tanto* credit for payments previously made to plaintiff by an insured defendant's liability carrier in settlement of her liability claim. The Appellate Division affirmed. *Riccio v. Prudential Property & Casualty Ins. Co.*, 195 *N.J.Super.* 167 (1984). Plaintiff argues for a *pro rata* application of the liability settlement amount in the calculation of the damages to which her UM benefits apply. We affirm.

I

The record contains a Settled Statement of Proceedings in Lieu of Transcript, submitted to the Appellate Division pursuant to *Rule* 2:5–3(e). The Stipulation of Facts in that Statement informs us that plaintiff's decedent, Donna Riccio, lost her life as the result of an automobile accident on August 31, 1979, when she was a passenger in a vehicle operated by Norbert Cardenas. An unidentified vehicle forced the Cardenas automobile off the road, causing it to strike a tree. Two other passengers were injured in the accident.

The Cardenas vehicle was insured by Aetna Insurance Company, with a per person bodily injury liability insurance limit of $50,000, a per accident limit of $100,000, and per person UM coverage of $15,000. In addition, because Donna was a full-time resident of her mother's household, there was additional UM coverage of $15,000 under Prudential's automobile insurance policy covering the vehicle of plaintiff, Isabelle Riccio.

Plaintiff sued Cardenas in the Law Division, where she asserted claims arising out of her daughter's death. That case was settled for a total of $41,500, paid out of the liability policy of Aetna, Cardenas's insurer.

Thereafter plaintiff filed a Demand for Arbitration against both Aetna and Prudential under the UM provisions of the respective policies. The arbitrator evaluated the claims at $61,000. Against that amount he credited the $41,500 previously paid by Aetna on the Cardenas liability policy, leaving a balance of $19,500 to be assessed against the two UM endorsements. The parties were apparently content to treat the Aetna policy, which covered the "host" vehicle, as primary. (The question of which UM carrier has the primary coverage has of course been obviated by the "anti-stacking" amendment to *N.J.S.A.* 17:28–1.1, which limits the recovery to "the higher of the applicable limits of the respective coverages" and "pro-rate[s] recovery between the applicable coverages as the limits of each coverage bear to the total of the limits." Although for pre-amendment cases, such as the one before us, the question of whether the "host" vehicle's UM carrier had the primary coverage was left without a definitive ruling in *Ciecka v. Transamerica Insurance Group*, 81 *N.J.* 421, 429 (1979), the issue is not presented in this appeal.) Therefore, because Aetna assumed primary UM coverage, its share of the $19,500 was acknowledged to be $15,000, the full amount of its UM coverage, and Prudential conceded its responsibility for the remaining $4,500.

Although ordinarily the arbitrator's function in arbitrations arising under the standard UM endorsement is limited to a determination of the uninsured's liability and the injured claimant's total damages, *see, e.g., In re Arbitration Between Grover and Universal Underwriters Ins. Co.*, 80 *N.J.* 221, 229 (1979); *Government Employees Ins. Co. v. Bovit*, 142 *N.J.Super.* 268, 373 (App.Div.), certif. den., 71 *N.J.* 502 (1976), here the arbitrator went further and decided "all of the issues in the case," although "it was not agreed that [his] decision on legal

issues would be binding." (Letter accompanying Award of Arbitrator.) He therefore determined that responsibility for the accident lay fifty percent with each driver, Cardenas and the "phantom" uninsured, of which determination more herebelow.

Plaintiff then moved in the Law Division (1) to vacate so much of the arbitrator's award as granted Aetna and Prudential a *pro tanto* credit for the amount paid, $41,500, in settlement of plaintiff's liability claim against Cardenas, and (2) for an Order compelling Prudential to pay the full amount of coverage available under its UM endorsement, namely, $15,000. She argued that because the arbitrator had found the uninsured motorist to be fifty percent at fault, the UM carriers should be responsible for one-half of the arbitrator's $61,000 award, or $30,500 (or so much thereof as is within their coverage, here a total of $30,000), and that because Aetna had already paid the full amount of its $15,000 UM coverage, Prudential should be held responsible for its entire $15,000 UM coverage. Plaintiff argued, in short, for a *pro rata* credit against the arbitrator's $61,000 award rather than a *pro tanto* reduction. The trial court, relying on *Ciecka v. Transamerica Insurance Group, supra*, 81 *N.J.* 421, rejected the claim and held Prudential responsible for $4500—$61,000 minus the $41,500 paid under Cardenas's liability policy with Aetna, minus the $15,000 paid under Aetna's UM coverage. The Appellate Division affirmed.

## II

We address first a subsidiary issue but one that is inextricably connected to the main question of how the liability settlement affects the extent of UM liability. As noted above, the arbitrator determined that the drivers—Cardenas, who had liability coverage with Aetna, and the "phantom" uninsured—shared responsibility for the accident on an equal basis. Whatever may be the propriety of an arbitrator addressing the question of comparative fault as between a UM-claimant *driver*

and an uninsured motorist (a "one-on-one" situation where a calculation of the comparative degrees of fault is unquestionably necessary), there is no need—indeed, it is beyond his submission—for the arbitrator to calculate respective degrees of fault of an insured operator and an uninsured driver when, as here, the one seeking the benefit of the UM coverage is an innocent claimant. The insured operator, not being represented in the arbitration in respect of his tort liability, cannot be bound by an arbitrator's determination that touches that irrelevant issue. The *only* liability question before the arbitrator in the "innocent claimant" case is the liability—in *any* degree—of the uninsured.

### III

A correct resolution of this appeal requires an understanding of exactly what it is that uninsured motorist insurance is and what it is designed to do. For those prepared to plumb the intricacies of a subject that was characterized at oral argument before us as "really quite simple"—which of course it is not—resort may be had to J. and J. Appleman, 8C & 8D *Appleman, Insurance Law and Practice* §§ 5066 to 5150 (1981) [hereinafter *Appleman* ], and Stanton, "Protection Against Uninsured Motorists in New Jersey," 3 *Seton Hall L.Rev.* 19 (1971) [hereinafter Stanton]. For our purposes today, however, it will suffice to emphasize only a couple of principles, albeit basic ones.

In the context of this case it is well to start with a statement of what uninsured motorist insurance is *not:* "such coverage is not insurance upon, nor for the benefit of, the uninsured tortfeasor * * *. There is no privity of contract between an insurer and such tortfeasor; it does not stand in his shoes, and it owes him no duty." 8D *Appleman, supra,* § 5071 at 81–83 (footnotes omitted); *see Senn v. J.S. Weeks & Co.,* 255 *S.C.* 585, 589, 180 *S.E.*2d 336, 339 (1971) ("The uninsured motorist provision does not insure the uninsured motorist. It is a contractual

liability required by statute between the insured motorist and his carrier and inures solely to the benefit of the insured.") What uninsured motorist insurance *is*, however, is a "gap-filler." It is "designed to afford maximum protection to a state's residents, and to fill gaps in compulsory insurance plans." 8D *Appleman, supra,* § 5057.45 at 41.

■ In New Jersey the mandatory offer of UM coverage was legislated in 1968. *L.* 1968, *c.* 385, effective January 2, 1969; *N.J.S.A.* 17:28–1.1. The stated purpose of the enactment was "to provide greater protection for the victims of the uninsured motorists," *see Gorton v. Reliance Ins. Co.,* 77 *N.J.,* 563, 571 (1978), which purpose the legislation undertook to fulfill by mandating the offer of UM coverage and at the same time making recourse to the Unsatisfied Claim and Judgment Fund unavailable to any insured under an automobile policy furnishing UM coverage, thereby affording the Fund much needed relief. *Ibid.* The statute, which now mandates the inclusion of UM coverage in all motor vehicle liability policies issued in this state, requires coverage for "payment of all or part of the sums which the insured or his legal representative shall be legally entitled to recover as damages from the operator of an uninsured motor vehicle, or hit and run motor vehicle * * *." Therefore, in order to collect under UM coverage, the claimant-insured must be able to prove an automobile liability case against the uninsured. See Stanton, *supra,* 3 *Seton Hall L.Rev.* at 29. To that end there have been imported into the UM endorsements the "normal rules governing tort liability and damages." *Ibid.; see Midland Ins. Co. v. Colatrella,* 102 *N.J.* 612, 617 (1986) ("[I]t is the insured's burden in an arbitration proceeding with the insurer to prove that the hit-and-run driver was negligent."). The overriding reality, however, is that although the insured claimant is remitted to common-law tort principles in establishing the liability of the uninsured and the nature and extent of damages, his rights under a UM endorsement are governed by the contract with the UM carrier.

Plaintiff's contract with Prudential contained the following under the heading "Limits of Liability":

(b) Any amount payable under the terms of this Part because of bodily injury sustained·in an accident by a person who is an uninsured under this Part shall be reduced by

(1) all sums paid on account of such bodily injury by or on behalf of (i) the owner or operator of the uninsured automobile and (ii) any other person or organization jointly or severally liable together with such owner or operator for such bodily injury * * *.

Prudential, relying on this policy language, claims that the courts below were correct in granting it a set-off from the total amount of damages ($61,000) for monies received ($41,500) from "a person or organization [Cardenas] jointly or severally liable" together with the uninsured owner or operator.

█ Plaintiff, on the other hand, renews her argument for a *pro rata* credit. The effect of her contention is that she is entitled to an aggregate award of $10,500 in excess of the arbitrator's $61,000 award—that is, the $61,000 should be reduced *not* by $41,500 but by fifty percent (the settling tortfeasor's *pro rata* share), to $30,500. Adding the $30,000 combined UM coverage of Aetna and Prudential to the $41,500 already received on the liability settlement would produce a total recovery of $71,500, or $10,500 more than the amount of damages determined by the arbitrator.

Plaintiff's argument springs from the following language in *Cartel Capital Corp. v. Fireco*, 81 *N.J.* 548 (1980), in which we noted the effect on the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1 to –5, of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3:

Under the joint tortfeasors law we had held that a settlement with a joint tortfeasor, even though for less than a pro rata share of the total claim, reduced the plaintiff's total claim against the nonsettling codefendant or codefendants by the pro rata share and thus barred contribution from the settling tortfeasor. Now the effect on the plaintiff of a joint tortfeasor's settlement will depend upon the percentage of fault found against him. *When one defendant settles, the remaining codefendant or codefendants are chargeable with the total verdict less that attributable to the settling defendant's percentage share.*

[81 *N.J.* at 569 (citations omitted, emphasis added).]

In further support of her position plaintiff relies on *Ciecka v. Transamerica Insurance Group, supra,* 81 *N.J.* 421, which she contends stands for the proposition that an insurance carrier that affords UM coverage may not take a *pro tanto* credit for monies paid to the insured in settlement of an action against an insured tortfeasor. This is the sentence she relies on: "By the same token we here determine that the statute compels both Transamerica and Home to make available their UM coverage *without any offset for payments heretofore made under Transamerica's liability coverage.*" 81 *N.J.* at 428 (emphasis added).

Prudential too finds support in *Ciecka* particularly in its declaration that an auto accident victim has *"prima facie* recourse to any and all policies applicable, *subject to the unquestionably implicit condition that his claims in the aggregate not exceed his damages. Id.* at 428 (emphasis added) (quoting *Motor Club of America Ins. Co. v. Phillips,* 66 *N.J.* 277, 292 (1974)).

The plaintiff in *Ciecka,* like plaintiff's decedent in this case, was a passenger in an insured automobile that was involved in an accident with an uninsured vehicle, resulting in personal injuries to plaintiff. 81 *N.J.* at 423. Transamerica, the liability carrier for the host driver, settled the plaintiff's Superior Court liability suit for $50,000, the limit of its liability coverage. Plaintiff, alleging damages in excess of $70,000, thereafter made a demand under Transamerica's UM endorsement on the host vehicle and the UM endorsement on his own automobile policy, written by Home Indemnity Insurance Company (each endorsement carrying a limit of the then minimum allowable amount of $10,000). *Id.* at 424. The carriers resisted arbitration on the ground that because plaintiff had already been paid the limit of Transamerica's liability policy, their UM coverages were beyond plaintiff's reach. *Id.* at 425. On Transamerica's appeal from a determination that both UM coverages were available, we held that Transamerica's available *coverage* was not cancelled out by its $50,000 payment to plaintiff under the

bodily injury liability coverage, for to permit a reduction of Transamerica's UM *exposure* would "disserve the purpose of a UM endorsement as expressed in [the uninsured motorists statute, *N.J.S.A.* 17:28–1.1] and as interpreted by our decision law." *Id.* at 426–27.

The effect of our decision in *Ciecka* was to make available to plaintiff insurance coverage totalling $70,000—$50,000 from the host driver's liability policy and a total of $20,000 under the two UM endorsements. It was in this context that we held that plaintiff had *"prima facie* recourse" to all policies, *id.* at 428,—a far different proposition from plaintiff's claim here that our holding declared *liability* for the total of the UM coverages. Obviously plaintiff's reliance on our comment, *ibid.*, that there could be no offset against the available UM *coverage* is misplaced. We meant precisely what we said: contrary to Transamerica's argument, the amount of its available UM *coverage* was not reduced by its liability payment; but we implied nothing about the extent of the ultimate UM *liability*, which of course would have to await an arbitrator's determination of the uninsured's liability to the plaintiff passenger and, assuming liability, the total amount of plaintiff's damages.

In reaching that conclusion in *Ciecka* we reaffirmed some basic principles of uninsured-motorist law: (1) the "excess escape" clause in the "other insurance" paragraph of the standard UM endorsement is invalid as an offset against available UM *coverage* under *Motor Club of America Insurance Co. v. Phillips, supra,* 66 *N.J.* 277; (2) we are committed to a liberal construction of automobile insurance legislation to effect "the broadest protection of auto accident victims consistent with the language of the pertinent statute," 81 *N.J.* at 428 (quoting *Phillips, supra,* 66 *N.J.* at 293); and (3) the injured insured has a right to be fully compensated for his injuries—but no more than that—by resort to available UM coverage with a *pro tanto* set off for monies already received from the insured driver.

The accident in *Ciecka* occurred before the effective date of the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3. Therefore the basis of the precise argument presented here by plaintiff (and a source of some concern to the Appellate Division, see 195 *N.J.Super.* at 169–71), namely, the effect of comparative negligence principles on availability and allocation of UM benefits, was not considered in that case. Nor, for that matter, was there any contention about the effect of the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1 to –5, even though the liability of the drivers was governed by that Law.

The Appellate Division observed that if the result of the case were to be governed by the *Cartel Capital* principle on which plaintiff relies, see *supra* at 500, that "[w]hen one defendant settles, the remaining codefendant or codefendants are chargeable with the total verdict less that attributable to the settling defendant's percentage share," 81 *N.J.* at 569, then plaintiff would have been correct in demanding the full $15,000 from the host's [sic: passenger's] uninsured motorist policy." 195 *N.J. Super.* at 170–71. But, reading *Ciecka* as we intended it to be read, the court below concluded that we did not intend in *Cartel Capital* to "overrule [the] limitation originally stated in 1974 and reiterated less than two months prior to the *Cartel Capital Corp.* opinion," *id.* at 171, "that *N.J.S.A.* 17:28–1.1 'unambiguously grants the victim *prima facie* recourse to any and all policies applicable, subject to the unquestionably implicit condition that his claims in the aggregate not exceed his damages.' " *Ibid.* (quoting *Ciecka, supra,* 81 *N.J.* at 428 (quoting *Motor Club of America Ins. Co. v. Phillips, supra,* 66 *N.J.* at 292)). The court below was correct: we did not intend to overrule that "limitation."

The goals and purposes of the uninsured motorist law differ from those of the Joint Tortfeasors Contribution Law and the Comparative Negligence Act. As we have pointed out, the uninsured motorist statute was designed to provide maximum remedial protection to the innocent victims of financially irresponsible motorists and to reduce the drain on the financially-

troubled Unsatisfied Claim and Judgment Fund. We have long since declared that the essential purpose of the legislation is to make the victim whole, but not provide a windfall or to allow a double recovery, as would be the result under the interpretation urged on us by plaintiff. We are fortified in our resistance to any result that would produce a double recovery by the fact that New Jersey has a strong public policy against it. For instance, the Unsatisfied Claim and Judgment Fund law, which is to be read *in pari materia* with the uninsured motorist statute, *Gorton v. Reliance Ins. Co.*, *supra*, 77 *N.J.* at 571, itself provides for *pro tanto* credits for monies received through settlement with other tortfeasors, *N.J.S.A.* 39:6–71(b). *See also Midland Ins. Co. v. Colatrella*, *supra*, 102 *N.J.* at 618 (when uninsured motorist injures worker, a compensation lien attaches to UM proceeds recovered by injured employee); *Silas v. Allstate Ins. Co.*, 129 *N.J.Super.* 99, 103 (App.Div.1974) (upholding medical-payments-offset clause in plaintiff's UM endorsement); *cf. Danesi v. American Mfrs. Ins. Co.*, 189 *N.J.Super.* 160, 166–67 (double recovery disfavored in workers' compensation).

■■ The policy behind the Joint Tortfeasors Contribution Law and the Comparative Negligence Act, on the other hand, is quite different. It is one of equity among joint tortfeasors— that is, those responsible for injury to an innocent victim should share equally the burden of recompense. The purpose is to relieve tortfeasors of an injustice among themselves. *E.g., Tramutola v. Bortone*, 118 *N.J.Super.* 503, 520 (App.Div.1972), rev'd on other grounds, 63 *N.J.* 9 (1973). Therefore, payment of more than a *pro rata* share entitles a tortfeasor to restitution, except as to a settling tortfeasor. *Tefft v. Tefft*, 192 *N.J.Super.* 561, 567 (App.Div.1983). As we have already observed, *supra* at 498, a UM insurer does not stand in the shoes of an uninsured tortfeasor. We are therefore satisfied that our result in favor of a *pro tanto* credit for any liability settlement against the damages assessed by the arbitrator in a UM pro-

ceeding best accords with the legislative intent and with the long-standing policy against double recovery.

If there appears to be an anomaly in that the pursuit of a tort claim, either to verdict or to settlement, against named defendants in a law court may produce quite different results from those obtained through the processing of a UM claim in arbitration, so be it. We do not seek perfect symmetry so much as faithful adherence to basic principles of contract law and to the legislative intent in respect of statutorily mandated uninsured motorist coverage.

## IV

Finally, we recognize that our opinion does not address a number of problems that lurk in the fringes of the fact pattern before us. At oral argument counsel for Prudential contended that the standard form Trust Agreement permits a UM carrier that has paid UM benefits to seek reimbursement not simply from an identified uninsured but from any other tortfeasor. It is in that proceeding that the respective degrees of fault of non-settling tortfeasors would be calculated. The pertinent language of the provision is as follows:

> In the event of payment to any person under this Part (UM coverage):
> (a) the company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury because of which such payment is made * * *.

We are informed that some courts interpret that language to restrict the UM carrier's right of subrogation to a claim against only the uninsured, whereas others agree with Prudential's contention set forth above. *See generally* 8D *Appleman, supra,* § 5128 to § 5135 at 144–250 (collecting cases). Although we see merit in Prudential's position, we defer a definitive ruling on the issue for a case in which it is squarely presented, as it is not here. Likewise do we recognize the issues posed in respect of the "written consent" exclusion, see *Government Employees Ins. Co. v. Shara,* 137 *N.J.Super.* 142

(Ch.Div.1975), and the validity of the "Reimbursement and Trust Agreement," see *Longworth v. Ohio Cas. Group,* 213 *N.J.Super.* 70 (Law Div.1986). The questions implicated in those policy provisions too are not directly before us and have not been briefed or argued, and today's decision intimates no view in respect thereof.

Affirmed. No costs.

*For affirmance*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For reversal*—1.