587 A.2d 1283

LORRAINE E. CURTS, PLAINTIFF–APPELLANT, v. ATLANTIC
MUTUAL INSURANCE COMPANY,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 4, 1991—Decided March 6, 1991.

386

Before Judges DREIER, ASHBEY and LANDAU.

*Michael E. Cozine* argued the cause for appellant, and on the letter brief.

*Francis X. Garrity* argued the cause for respondent (*Garrity, Fitzpatrick, Graham, Hawkins & Favetta*, attorneys; *David C. Barry* on the brief).

The opinion of the court was delivered by

LANDAU, J.A.D.

This case requires us to determine whether summary judgment was properly granted in favor of defendant Atlantic Mutual Insurance Company (Atlantic Mutual), an Automobile Personal Insurance Protection (PIP) carrier, on a suit by plaintiff-appellant Lorraine E. Curts (Curts) to recover the value of medical services provided following an automobile accident, pursuant to her contract with the Presbyterian Homes of New Jersey (Presbyterian).

Presbyterian, a non-profit corporation, is, according to the contract of record, "organized exclusively for religious, charitable and *hospital* purposes, and for the moral and mental improvement of men and women." (Emphasis supplied). It operates a senior residence facility known as Meadow Lakes. There, in accordance with agreements such as that signed by the 79-year old Curts, Presbyterian provides living accommodations, meals and other services to seniors in consideration of the payment of a substantial "capital fee" and specified monthly amounts thereafter.

Among the services which Presbyterian agrees to provide are: "f. Medical and hospital care ... in accordance with the paragraph entitled 'Provisions for Medical Care.' "

A copy of the medical care provisions and a brief addendum which excludes certain cancer benefits, is attached as an Appendix hereto. In general, the provisions include medical, surgical, hospital, and nursing care, both on-site and, when necessary, at off-site hospitals, subject to defined exceptions. Certain subrogation rights are preserved. Presbyterian reports annually to each resident the amount of monthly occupancy charges which has been attributed to the medical care provisions. The Internal Revenue Service has treated that allocated amount in the same manner as other deductible medical expenses. *See Rev. Rul.* 67–185, 1967–1 *C.B.* 70; *Rev.Rul.* 76–481, 1976–2 *C.B.* 70.

The record includes a statement from Presbyterian showing that the actual medical charges attributable to Curts' accident were $11,575.48. These included an allocation for Curts' substantial hospital stay and physical therapy visits, as well as x-ray and pharmacy charges. Curts suffered a broken leg in the accident. There is no indication that Curts had to make any out-of-pocket disbursements, inasmuch as the Presbyterian contract covered all of her charges.

During oral argument on the summary judgment motion, the trial judge and counsel for Atlantic Mutual agreed that had Curts been insured under a more traditional insurance program which provided her medical benefits, she would have been entitled to recover personal injury protection benefits under the PIP provisions of her automobile insurance policy. Summary judgment appears to have been granted to Atlantic Mutual based upon the trial judge's analysis of our opinion in *Sanner v. Government Employees Ins. Co.*, 150 *N.J.Super.* 488, 376 *A.*2d 180 (App.Div.1977), *aff'd o.b.*, 75 *N.J.* 460, 383 *A.*2d 429 (1978), and of the County Court opinion in *Bernick v. Aetna Life and Casualty*, 158 *N.J.Super.* 574, 386 *A.*2d 908 (Cty.Ct. 1978). Essentially he held that no medical expenses were

"incurred" by Curts, and so there could be no medical expense benefits due under the PIP portions of Curts' automobile policy.

A review of applicable legislation and case law discloses an anomalous pattern respecting duplicate recovery of benefits. At the time of Curts' accident and medical treatment, the definition of medical expense benefits contained in *N.J.S.A.* 39:6A–4 read:

> Payment of all reasonable medical expenses incurred as a result of personal injury sustained in an automobile accident. In the event of death, payments shall be made to the estate of the decedent. In the event benefits paid by an insurer pursuant to this subsection are in excess of $75,000.00 on account of personal injury to any one person in any one accident, such excess shall be paid by the insurer in consultation with the Unsatisfied Claim and Judgment Fund Board and shall be reimbursable to the insurer from the Unsatisfied Claim and Judgment Fund pursuant to section 2 of *P.L.*1977, *c.* 310 (C. 39:6–73.1).

That statute was considered by both the *Sanner* and *Bernick* courts in conjunction with the provisions of *N.J.S.A.* 39:6A–6, which since the enactment of the No Fault Act has provided that medical benefits defined in *N.J.S.A.* 39:6A–4 shall be payable without regard to collateral sources. The "without regard to collateral sources" language was, at the time of the *Sanner* and *Bernick* decisions, subject to an exception for benefits collectible under Workers' Compensation Insurance, Employees' Temporary Disability Benefits statutes and Medicare. Following those decisions and our previous opinion in *Lapidula v. Government Employees Ins. Co.*, 146 *N.J.Super.* 463, 370 *A.*2d 50 (App.Div.1977), the Legislature expanded those statutory exceptions to the "without regard to collateral sources" rule to include benefits "in fact collected" which were provided under federal law to active and retired military personnel. The change was made by amendment effective March 31, 1981. *See L.*1981, *c.* 95.

Significantly, both *Sanner* and *Bernick* recognized that there was a difference between benefits provided under government programs without cost to the injured party and instances where the injured party's personal hospitalization policy provided medical expense benefits similar to those required by the PIP

statute. *See Sanner, supra*, 150 *N.J.Super.* at 495, 376 *A.*2d 180; *Bernick, supra*, 158 *N.J.Super.* at 582, 386 *A.*2d 908. Indeed, the draftsman of the No Fault Act wrote, shortly after its adoption:

> The Act provides that medical expense benefits shall be paid without regard to payments from a collateral source except that benefits collectable [sic] from workmen's compensation insurance, temporary disability benefits, and medicare shall be deducted from the benefits that are collectible under the benefit provisions of the Act. (footnote omitted.) The emphasis is upon the language "benefits collectible." The injured person cannot elect under which coverage he wishes to be paid. If there are collectible workmen's compensation, temporary disability, or medicare benefits, the benefits under the Act are reduced by such collectible amount.
>
> A duplication of payments of medical expenses will result in those instances, for example, wherein one's own personal hospitalization insurance policy provides coverage similar to that provided within the Act. The medical expense benefits provided within the Act are not reduced by the amounts collectible under such hospitalization insurance. In such event, the injured person is justified in collecting not only medical expense benefits, but also the hospitalization insurance benefits.
>
> One may witness future hospitalization insurance policies containing exclusionary clauses directed toward avoiding the above mentioned duplication in payments. Hopefully, the advent of such exclusionary clauses will be accompanied by the appropriate reduction in premium rates.
>
> New Jersey Blue Cross and Blue Shield has amended its coverages so as to exclude coverage for payments of medical expenses covered by personal injury protection benefits. Blue Cross and Blue Shield's premium rates were adjusted to compensate for the reduction in coverage.

Iavicoli, *No Fault & Comparative Negligence in New Jersey* § 13, at 44–45 (1973).

It is also significant that as of the time we review and decide this case, the Legislature has seen fit to delete the word "incurred" from the definition of medical expense benefits. *See N.J.S.A.* 39:6A–4, *Historical and Statutory Notes*, at 264; *L.*1990, *c.* 8, § 4.

Another expression of legislative intent may be found in *N.J.S.A.* 2A:15–97, enacted in 1987. That specifically excludes actions brought pursuant to the No Fault Act from the general rule that personal injury plaintiffs must disclose receipt of any other personal injury benefits and that such benefits, less insurance premiums, be deducted from any award received.

In *Dillione v. Deborah Hospital,* 113 *N.J.Super.* 548, 274 *A.*2d 597 (App.Div.1971), we recognized as the "general rule" that an insured will not be barred from recovery on a policy providing for payment of hospital or medical services for which he has " 'incurred expense,' or similar language, by mere reason of the availability of collateral means of discharging his liability therefor so as to have relieved him of the need to pay the charges personally." *Id.* at 554, 274 *A.*2d 597 (citations omitted). *See also Feit v. St. Paul Fire & Marine Insurance Co.,* 209 *Cal.App.*2d *Supp.* 825, 27 *Cal.Rptr.* 870 (Cal.App. Dep't Super.Ct.1962).

Commentators have considered this issue. Discussing the pioneer Massachusetts No Fault Statute, Keeton and Widiss noted, "[t]he injured party may collect medical expenses from both the automobile insurance company and—absent contrary provisions in the other contracts—from any accident or health insurance company ..." Keeton and Widiss, *Insurance Law* § 4.10, at 418 (1988).

Appleman states:

... the tendency has been to allow double recovery where collection of the first benefits has been from a completely different source, such as a hospitalization policy.... Opinions may differ as to the wisdom of this, since it may be considered that such permits a double recovery for the same expenses. However, it might be borne in mind that it is unlikely that one would undergo serious injury merely for the purpose of recouping duplicate expenses.... If this were considered against public policy, then insurers would be forbidden to sell contracts guaranteeing payment of a fixed sum per day while one is hospitalized when it is known that the hospital expense will be paid by Blue Cross or Medicare.

Appleman, *Insurance Law and Practice* § 4902.75, at 295 (1981).

Recently, in *O'Boyle v. Prudential,* 241 *N.J.Super.* 503, 509, 575 *A.*2d 515 (App.Div.1990),[1] we said, "We see no intent in *N.J.S.A.* 39:6A–6 to require deduction of privately available collateral benefits from PIP benefits. If the Legislature had so

---

[1] *O'Boyle* considered the question of collateral income continuation benefits.

intended, the statute no doubt would have mentioned such voluntary or private benefits purchased independently by automobile accident victims...."

■ Thus, while we recognize the existence of a general policy in the State against permitting double recoveries, *see, e.g., Riccio v. Prudential Property & Cas. Ins. Co.,* 108 *N.J.* 493, 504, 531 *A.*2d 717 (1987); *Cirelli v. The Ohio Casualty Insurance Co.,* 72 *N.J.* 380, 388, 371 *A.*2d 17 (1977); *N.J.S.A.* 2A:15–97, we are not free to disregard the overwhelming legislative and interpretive authority which recognize a limited exception to this policy in cases where a PIP insured is also covered under a private health benefits contract. The exclusion for collateral benefits contained in *N.J.S.A.* 39:6A–6 cannot be ignored.

This interpretation is further fortified by the legislative history of *N.J.S.A.* 39:6–86.1, *et seq.,* respecting Unsatisfied Claim and Judgment Fund claims. A 1983 amendment to *N.J.S.A.* 39:6–86.2 deleted the phrase "without regard to collateral sources" from the payment of benefits language, but, significantly, substituted a clause which provided that benefits collectible under "any hospital, medical or dental benefit plan or policy coverage with benefits similar to those provided under Section 7 (*N.J.S.A.* 39:6–86.1) in an amount not to exceed in the aggregate $2,500.00 for any one accident, shall be deducted from the benefits collectible under Sections 7 and 10." *L.*1983, *c.* 362, § 4. Thus, except for a $2,500.00 deductible, the Legislature permitted recovery of duplicate benefits by persons holding hospital and medical plans or policies, even against the Unsatisfied Claim and Judgment Fund. A 1990 amendment to *N.J. S.A.* 39:6–86.1 deleted the word "incurred" in the medical expense benefits paragraph, *L.*1990, *c.* 8, paralleling the similar deletion in *N.J.S.A.* 39:6A–4. These expressions of legislative intent are particularly important because of the interrelationship between the Unsatisfied Claim and Judgment Fund Statute

and the No Fault Law regarding payment of medical expense benefits over $75,000. *See N.J.S.A.* 39:6A–4a.

Our analysis would not be complete without reference to the recent statutory changes to *N.J.S.A.* 39:6A–4.3 affecting policies issued or renewed on or after January 1, 1991. From and after that date, automobile insureds can exercise an option "that other health insurance coverage or benefits of the insured, including health care services provided by a health maintenance organization and any coverage or benefits provided under any federal or State program, are the primary coverage in regard to medical expense benefits...." *N.J.S.A.* 39:6A–4.3d.[2] Thus, an avenue for resolution of the double benefits problem now exists, which affords an automobile insurance purchaser opportunity to realize a premium reduction by reason of the existence of other medical benefits coverage. This was previously realizable only to the extent of an option to elect medical expense benefit deductibles up to $2,500. *N.J. S.A.* 39:6A–4.3a.

As the above discussion illustrates, Curts would not have been barred from receiving personal injury benefit payments either on the basis of not having "incurred" any expenses or on the basis of her receipt of collateral benefits, had she been insured under a conventional medical benefits policy or with an HMO. We fail to see why a different rule must be applied to Curts because her medical benefits plan is part of an agreement which provides other extensive benefits to the elderly. Presbyterian's medical benefits program is much the same as an HMO plan. This is not a case in which free governmentally-sponsored medical benefits were provided, nor even one in which no-cost medical benefits were provided by a charity. Curts prepaid by contract in exchange for the medical benefits received, just as surely as if she had paid a health insurance carrier's premium or enrolled in an HMO for like

---

[2]P.I.P. coverage is otherwise primary. *N.J.S.A.* 39:6A–4.2.

benefits. The nature and character of such a prepaid medical benefit program is not altered by its inclusion in a more extensive program. Certainly we see no policy reason so to hold.

Whatever doubts may be harbored about the wisdom of retaining collateral benefits for anyone in this limited PIP area, despite the trend towards elimination of double recovery, those doubts alone furnish insufficient basis to treat Curts differently than persons covered under more orthodox plans. Neither do those doubts justify a deviation from the statutory scheme. *See O'Boyle, supra,* 241 *N.J.Super.* at 509, 575 *A.*2d 515.

We hold, therefore, that summary judgment should not have been granted to Atlantic Mutual. The trial judge's implicit denial of Curts' cross-motion for summary judgment was not appealed. In any event, the matter now requires attention at the trial level to questions which, probably by reason of the grant of summary judgment to Atlantic Mutual, were not considered below. Was there a deductible in Curts' policy? Is any co-payment required under *N.J.S.A.* 39:6A–4.3, to the extent applicable at the time of the medical benefit payments? Additionally, the trial judge must now address the questions of interest and attorney's fees, inappropriately argued to us on appeal, in light of our substantive ruling.

We reverse the grant of summary judgment to Atlantic Mutual. The matter is remanded to the trial judge for resolution of the remaining issues and reconsideration of Curts' motion for summary judgment consistently with this opinion.

# APPENDIX

. ＊ ＊ ＊

**5.** *Provisions for Medical Care*

The Corporation will provide medical and nursing care, when needed, for residents of Meadow Lakes in the manner following:

a. The Corporation will maintain an infirmary at Meadow Lakes for the benefit of the Residents.

b. The Corporation will provide physicians, and will pay for surgical care (which must be given elsewhere, since Meadow Lakes has no operating room). A physician will have office hours at the infirmary and will be on call at all other times. The Corporation will not furnish dental or chiropractic care, or care in ophthalmology, osteopathy or chiropody, or care prescribed by any religious sect. The Resident is at liberty to engage the services of a physician or practitioner other than a staff physician, at the Resident's expense, but the Corporation is not responsible for or obligated to defray the charges of any such outside physician or practitioner. If care or treatment is to be suplied by any such outside physician or practitioner at Meadow Lakes, such care or treatment must be authorized in advance by the Corporation. Residents entitled to medical care by state or municipal agencies will be required to make application for such care or payments, and the following provisions shall be applicable:

(i) The Resident shall from time to time apply for the payment to any hospital, skilled nursing facility or other provider of services, or to any doctor (including reimbursement to the Corporation, if payment is made by it), of any and all amounts payable for services rendered to the Resident and for which benefits are available pursuant to the Social Security Amendments of 1965 (commonly known as "Medicare") or like type legislation, whether Federal or State, now or hereafter enacted. If the Resident fails to make such application the Corporation has the right to terminate this Agreement, as is provided in paragraph 6(a) (ii) hereof.

(ii) The Corporation shall not be liable for payment for hospital, medical, or other like services which are paid for by the Federal or State source involved. Any and all other services shall be paid for by the Corporation as set out in this Agreement.

(iii) Any such benefits so paid from Federal or State sources shall be paid or credited, first, against any charge other wise due from the Resident with respect to the hospital, medical or other service involved; next, to reimburse to the Resident any payment made by the Resident for the service involved; and next, the remainder of such benefits, if any, shall be paid to the Corporation to reimburse it for any payment it has made for such service, or for application on account of such service, as the Corporation may direct.