656 A.2d 413

LINDA B. DUNN, INDIVIDUALLY, AND AS THE ADMINISTRA-
TRIX AD PROSEQUENDUM OF THE ESTATE OF CAREY
DUNN, PLAINTIFF, v. DONALD E. PRAISS, M.D., AND MAR-
THA BRUMBAUGH, M.D., DEFENDANTS.

JOEL E. MARMAR, M.D., AND SOUTH JERSEY UROLOGIC ASSO-
CIATES, DEFENDANTS–RESPONDENTS, v. HEALTH CARE
PLAN OF NEW JERSEY, DEFENDANT–APPELLANT.

Argued January 18, 1995—Decided April 18, 1995.

*Richard A. Grossman* argued the cause for appellant (*Grossman & Kruttschnitt,* attorneys; *Herbert Kruttschnitt, III,* of counsel; *Eli L. Eytan,* on the brief).

*Stephen M. Greenberg* argued the cause for respondents (*Stern & Greenberg,* attorneys; *Mr. Greenberg* and *Jeffrey Speiser,* on the brief).

The opinion of the Court was delivered by O'HERN, J.

This appeal concerns the concurrent duties of a health maintenance organization (HMO) and the physicians who contract with the HMO to deliver medical services.

Traditionally the prohibition on the corporate practice of medicine stemmed from a perceived need to protect the public from the commercial exploitation of the practice of medicine. "It has been said to be against public policy to permit a 'middleman' to intervene for profit in establishing the professional relationship between members of the medical profession and members of the public." Michael A. Dowell, *The Corporate Practice of Medicine Doctrine Must Go,* HealthSpan, Nov. 1994, at 7, *available in* WESTLAW, HealthSpan Database, *4.

Ever-increasing complexity and costs have brought about vast changes in the delivery of medical services. Today, most would not recognize Norman Rockwell's portrait of the family doctor. The 1973 Health Maintenance Organizations Act, *N.J.S.A.* 26:2J–1 to –30 (HMO Act), authorized the creation of corporate HMOs. The HMO Act states that such organizations "shall not be deemed to be practicing medicine" and exempts such organizations from licensure relating to the practice of medicine. *N.J.S.A.* 26:2J–25c. Although it grants immunity to certain HMO employees, the HMO Act does not confer immunity from medical mal-

practice lawsuits on the HMO itself. *Robbins v. HIP of New Jersey*, 264 *N.J.Super.* 572, 625 *A.*2d 45 (Law Div.1993).

> [A] potential exists for HMOs to be held liable for medical malpractice based on one or more of several tort theories: (1) vicarious liability on the basis of *respondeat superior* or ostensible agency; (2) corporate negligence based upon negligent selection and negligent control of the physician; and (3) corporate negligence based upon the corporation's independent acts of negligence, *e.g.* in the management of utilization control systems. Contract law might also be utilized to hold HMOs liable for malpractice based on breach of contract or breach of warranty. See Oakley and Kelley, *HMO Liability for Malpractice of Member Physicians: The Case of IPA Model HMOs*, 23 Tort and Insurance Law Journal 624, 626 (1988).
>
> > [*Raglin v. HMO Illinois, Inc.*, 230 *Ill.App.*3d 642, 172 *Ill.Dec.* 90, 93, 595 *N.E.*2d 153, 156 (Ill.App.Ct.1992).]

This case implicates the first and third of those theories. A physician-provider who has been found guilty of medical malpractice seeks contribution from his HMO on the basis of its independent breach of contractual duty to a patient-subscriber of the HMO. We hold that such a claim may be asserted but is procedurally barred in the circumstances of this case.

## I

In May 1982 Carey Dunn, a Philadelphia Navy Yard worker, experienced swelling and pain in his scrotal area. A private physician treated him, and his condition improved with antibiotics. Later that year Dunn joined the Health Care Plan of New Jersey (HCP). Dr. Martha Brumbaugh became Dunn's primary physician at HCP. The "official description of benefits" under the plan said (emphasis added):

> This Plan is a group-practice prepayment plan, sometimes called a Health Maintenance Organization or HMO. It offers more than health insurance alone * * *.
>
> \* \* \* \* \* \* \*
>
> Plan members receive health care from a large number of well qualified, highly trained physicians. When a new member joins HCP he or she will select a "primary physician" or "family doctor" from the HCP Medical Staff. This doctor becomes the member's personal physician and *assumes responsibility for coordinating the member's total health program.*

In December 1982 Dunn's symptoms recurred. In January 1983 Dr. Brumbaugh diagnosed a recurrence of epididymitis (inflammation of the tissues surrounding the testicle). She referred Dunn to Dr. Donald Praiss of South Jersey Urologic Associates (SJUA), a group that contracted with HCP to provide services to HCP subscribers. Dr. Praiss diagnosed an atrophic (shrunken) testicle with persistent hydrocele (collection of fluid) and a possible hernia. He sent Dunn for a scrotal scan, which showed some type of mass, but did not determine its composition. These are the crucial dates:

2/14/83 ● Scrotal scan revealed mass. Dr. Praiss ordered no further tests to determine if the mass was cancerous, but scheduled a return appointment.

2/22/83 ● Dr. Joel Marmar (another SJUA physician) examined Dunn and told him to note any change in the size of the mass through self-examination. Dr. Marmar ordered no further tests and scheduled no return appointments. Neither the scrotal scan results nor the SJUA physicians' evaluations reached Dr. Brumbaugh, who had no further contact with Dunn.

11/28/83 ● Dunn, complaining of a "full feeling" in his chest, saw Dr. Brumbaugh, who ordered medication and various tests.

12/83 ● Oncological tests disclosed testicular cancer that had spread to the liver.

After extensive chemotherapy, Dunn died on April 30, 1985.

Carey Dunn's widow, Linda Dunn, sued HCP, Dr. Brumbaugh, Dr. Marmar, Dr. Praiss, and SJUA. She asserted claims of medical malpractice against the individual physicians, and against HCP as their principal. She also asserted independent claims against HCP, including breach of contract based on Dr. Brumbaugh's failure to review and follow up the urologists' reports. Dr. Marmar and SJUA asserted cross-claims for contribution and indemnification against their codefendants.

The case was tried to a jury in June and July 1990. At the end of plaintiff's case, HCP moved to dismiss all claims against it, both the claims based on *respondeat superior* and the claims of inde-

pendent liability. The trial court dismissed all of the claims against HCP, as well as the claims against all of the other defendants, except for Dr. Marmar and his group, SJUA (collectively, Dr. Marmar).

After the trial court dismissed plaintiff's claims against HCP, plaintiff's counsel asked the court whether Dr. Marmar's cross-claims against HCP would be dismissed.

[Plaintiff's Counsel]: I'm just assuming this dismisses that cross-claim and all facts alleged by Dr. Marmar against the HCP as well? I assume it's all inclusive, they are not still going forward to prove facts that it was HCP and not they that didn't fail to discharge the responsibility?

The Court: I didn't consider the cross-claim.

[Dr. Marmar's counsel]: *I would state for the record, I have no evidence that HCP would have done anything deemed negligent. I would not submit any evidence on that.* The only thing seems to me, if counsel for the plaintiff is correct, ultimately that there was some vicarious responsibility, your Honor's comments today, they would share in that liability that we ultimately bear in this case I think takes care of that.

The Court: All I say, they may be bound if, you have to look at * * * [*Pappas v. Santiago,* 66 *N.J.* 140 (1974) ], they were invited if they want to continue and the law says they can continue in the participation of the trial where you are continuing along with the theory of damages because quite conceivably if there is an award and they have been let out and there's a tort feasor still remaining, they may be on the rug for damages, so they still have a right to participate in the trial if they want to.

[Dr. Marmar's counsel]: I understand.

[Emphasis added.]

The trial court did not further address the cross-claims but instead asked HCP whether, pursuant to *Pappas v. Santiago,* 66 *N.J.* 140, 145, 329 *A.*2d 337 (1974) (codefendant who prevails at separate trial on liability issue is entitled to participate in trial on damages, since he will be bound by damages fixed if favorable liability ruling is reversed), it wished to continue to participate in the trial on the issue of damages even though it was no longer a party. HCP declined. Dr. Marmar concedes that the cross-claims were effectively dismissed at that time, though the court entered no such order.

The case proceeded to trial against Dr. Marmar. The jury returned a verdict in favor of plaintiff in the sum of $2,904,240.54,

apportioning ten percent fault to the decedent and ninety percent to Dr. Marmar.

Plaintiff appealed, claiming that HCP had been improperly dismissed as a party, and that HCP was not only liable as Dr. Marmar's principal but also had direct liability for breach of contract. Dr. Marmar cross-appealed (1) the trial court's denial of certain expert testimony on the liability issues and (2) various damage issues, most notably the issue in *Tenore v. Nu Car Carriers, Inc.*, 67 *N.J.* 466, 482, 341 *A.*2d 613 (1975) (holding that introduction of evidence prepared by expert witnesses purporting to show an injured plaintiff's aggregate damages is improper). Dr. Marmar did not appeal the dismissal of his cross-claims against HCP.

The Appellate Division held that HCP was vicariously liable for Dr. Marmar's actions on a theory of *respondeat superior* or agency, and that it was therefore not necessary to analyze plain-tiff's contract theory. It affirmed the liability judgment but remanded for retrial *on damages only* because of trial errors:

> Plaintiff has requested that we overturn the trial judge's determination to dismiss plaintiff's claims against the HMO. Plaintiff has couched her argument in terms of a contractual duty based upon the [HMO's] promotional literature. We need not analyze the contractual theory advanced by plaintiff, since it is apparent to us that Health Care Plan of New Jersey is responsible for Dr. Marmar's actions on theories of *respondeat superior* or agency.

> * * * * * * * *

> * * * We therefore hold that under these circumstances both Dr. Marmar (and South Jersey Urologic Associates) and the HMO are responsible to plaintiff for such damages as may be assessed by reason of Dr. Marmar's actions.

> * * * * * * * *

> The liability judgment is affirmed; the Health Care Plan of New Jersey is deemed responsible on a principal-agent basis for the acts of Dr. Marmar; the damage judgment for decedent's pain, suffering, and related losses is remanded to the Law Division for consideration whether there should be a comprehensive damage trial; the wrongful death and loss of consortium damage judgments are reversed and the matter is remanded to the Law Division for retrial on these latter issues.

> [256 *N.J.Super.* 180, 193, 195, 202, 606 *A.*2d 862 (App.Div.1992).]

HCP petitioned for certification concerning the imposition of vicarious liability. Plaintiff cross-petitioned for certification, seeking review of the portion of the judgment vacating the award for damages and review of the Appellate Division's "[a]ffirmance of the dismissal of the breach of contract claim against HCP and Dr. Brumbaugh." Dr. Marmar opposed plaintiff's cross-petition. He did not petition for certification on the dismissal of his cross-claim. This Court denied both petitions. 130 *N.J.* 20, 611 *A.*2d 657 (1992).

On remand to the Law Division, Dr. Marmar sought to include a trial of "the pending crossclaims between Dr. Marmar and HCP" in that proceeding. HCP insisted that there were no pending cross-claims and urged the court to resolve the asserted cross-claims after the damages trial because the cross-claims involved a "question of law." The trial court agreed with HCP and directed a trial on damages, after which it would consider any cross-claims. HCP elected not to participate in the damages trial.

Prior to retrial, Dr. Marmar settled with plaintiff for $2,904,-160.54, $80.00 less than the original jury verdict. Plaintiff assigned to Dr. Marmar any remaining rights that she had. The trial court then ordered argument to determine whether any issues concerning HCP remained. Dr. Marmar claimed that he had a valid cross-claim against HCP. Dr. Marmar's counsel made the following offer of proof: "[W]e say there is fault and we will prove that because we have witnesses who will show what they [HCP] didn't do and they should have done and that they were absolutely actively negligent." He argued that liability as between Dr. Marmar and HCP had never been tried on the merits because under *Rule* 4:37–2 the cross-claims had been automatically dismissed when plaintiff's claims were dismissed. Because the dismissal of HCP on vicarious-liability grounds had been reversed, the cross-claims must be reinstated.

HCP countered that Dr. Marmar's cross-claims were dismissed not because the court rule triggered such dismissal, but because Dr. Marmar had acknowledged having no proof of HCP's indepen-

dent liability. Moreover, HCP argued, the Appellate Division had not reversed the finding of no liability under breach of contract or negligence (it had simply resolved the *respondeat superior* issue) and therefore those findings stood. The trial court ruled that the Appellate Division had implicitly affirmed its dismissal of the cross-claims.

Dr. Marmar appealed from the dismissal of his cross-claims. The Appellate Division remanded to determine whether any viable claims against HCP, if proven, could have been independent proximate causes of plaintiff's injuries and death. If so, damages should be apportioned between HCP and Dr. Marmar. If any of the cross-claims against HCP led only to vicarious responsibility, they would be dismissed (because Dr. Marmar and SJUA had agreed to indemnify HCP for any losses occasioned by the SJUA physicians' negligence). The court said that "[i]t would be inequitable to reinstate plaintiff's claims against the HMO (which in turn provide a basis for an indemnification claim against Dr. Marmar) without permitting the doctor and the urologic group to show that there is a valid basis to claim contribution against HCP." 271 *N.J.Super.* 311, 320, 638 *A.*2d 875 (1994).

The Appellate Division determined that plaintiff had no viable negligence claim directly against HCP and noted that Dr. Marmar had conceded that he had "no evidence that HCP would have done anything deemed negligent." Therefore, the court said, Dr. Marmar preserved his cross-claims against HCP, but those cross-claims "solely encompassed the right to assert contribution for plaintiff's contractual claim or claims based on agency or *respondeat superior.*" 271 *N.J.Super.* at 322, 638 *A.*2d 875.

The Appellate Division further decided that Dr. Marmar's contribution claim may be based on HCP's alleged breach of contract with Carey Dunn:

> We can * * * see no reason not to apportion responsibility based upon any civil wrong, including a breach of contract, that proximately causes a personal injury. A person who is injured as a result of the breach of a defendant's contractual duty should have no less legal recourse than a person injured as a result of the breach of a general duty of reasonable care.
>
> [271 *N.J.Super.* at 324, 638 *A.*2d 875.]

This Court granted HCP's petition for certification. 137 *N.J.* 308, 645 *A.*2d 137 (1994).

## II

There are two issues in this case: (1) Can there be contribution between a party whose breach of contract is the proximate cause of personal injury and another party whose negligence is a proximate cause of the same injury? and (2) If so, did Dr. Marmar adequately preserve the right to assert such a cross-claim?

### A.

The common-law doctrine that forbade contribution between joint tortfeasors was based on the same theory as that of contributory negligence, that "[a]ny fault kept a claimant from recovering under the system," *Ostrowski v. Azzara,* 111 *N.J.* 429, 436, 545 *A.*2d 148 (1988), whether that claimant was a plaintiff seeking compensation from a defendant or one joint tortfeasor looking for contribution from another. At common law, the plaintiff was free to choose which of multiple tortfeasors to sue and from which among them to seek satisfaction of any judgment. A defendant in a tort action had no right to implead other suspected tortfeasors or to seek from fellow tortfeasors contribution for payments made in excess of his or her proportion of fault. *Young v. Latta,* 123 *N.J.* 584, 588–89, 589 *A.*2d 1020 (1991). To ameliorate the harshness of that theory, which "did violence to basic equitable notions that those whose fault caused the injury should, in good conscience, bear their just shares of the burden," *Kennedy v. Camp,* 14 *N.J.* 390, 400, 102 *A.*2d 595 (1954) (Jacobs, J., concurring), the Legislature in 1952 enacted the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1 to –5 (JTCL). The JTCL provides that if any one of the joint tortfeasors pays a judgment to an injured person, that tortfeasor is entitled to recover contribution from the other joint tortfeasors "for the excess so paid over his pro rata share." *N.J.S.A.* 2A:53A–3.

The Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.3, enacted in 1973, modified the JTCL's pro-rata apportionment of liability among joint tortfeasors. (The Comparative Negligence Act was amended by *L.*1987, *c.* 325 and *L.*1987, *c.* 404. The amendments substantially modified rules of joint-and-several liability with respect to the extent of contribution in certain circumstances not present here.) Joint tortfeasors no longer share liability on a pro-rata basis but instead on the basis of proportion of fault as determined by the trier of fact. The effect of the Comparative Negligence Act on contribution is to measure the remedy by percentage of responsibility rather than by the number of culpable parties.

In *Blazovic v. Andrich,* 124 *N.J.* 90, 98, 590 *A.*2d 222 (1991), we explained that it is "well-settled that the [Comparative Negligence] Act's application is not limited to negligence actions." For example, in *Suter v. San Angelo Foundry & Machine Co.,* 81 *N.J.* 150, 161, 406 *A.*2d 140 (1979), the Court reasoned that such a limitation would frustrate the legislative intent to mitigate the unfairness associated with the total bar to recovery posed by common-law contributory negligence. Consequently, the Court determined that the Comparative Negligence Act "was intended to cover fault in a broader sense rather than in the technical narrow negligence concept." *Id.* at 162 n. 2, 406 *A.*2d 140. The Court held that "the Comparative Negligence Act is applicable to strict liability actions in those circumscribed areas in which plaintiff's conduct may be found to constitute contributory negligence." *Id.* at 164, 406 *A.*2d 140.

In *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.,* 32 *N.J.* 55, 77, 159 *A.*2d 97 (1960), the Court held that under the JTCL, a negligent defendant could seek contribution from a strictly liable codefendant who was the operator of an airplane that without fault fell from the sky. Later, in *Blazovic, supra,* 124 *N.J.* at 107, 590 *A.*2d 222, we held that "responsibility for a plaintiff's claimed injury is to be apportioned according to each party's relative degree of fault, including the fault attributable to an intentional

tortfeasor." Finally, in *Childs v. New Jersey Manufacturers Insurance Co.,* 108 *N.J.* 506, 531 *A.*2d 723 (1987), and *Riccio v. Prudential Property & Casualty Insurance Co.,* 108 *N.J.* 493, 531 *A.*2d 717 (1987), we explained how the usual principles of comparative negligence under the JTCL were to be modified when part of the recovery was based on contract under the uninsured motorist endorsements of an automobile liability insurance policy.

A common thread that runs through most of those decisions is a concept of fault, whether based on the failure to insure that a product fulfills its warranty (*Suter, supra,* 81 *N.J.* 150, 406 *A.*2d 140), an absolute liability for ultra-hazardous activity imposed by statute (*Adler's Quality Bakery, supra,* 32 *N.J.* 55, 159 *A.*2d 97), or the intentional infliction of injury on another (*Blazovic, supra,* 124 *N.J.* 90, 590 *A.*2d 222).

In the context of this case in which the breach of contractual duty appears to parallel closely the fault-based duty of care imposed on a health-care provider, it is appropriate to allow for contribution. In another case the issue might be less clear. For example, assume that an HMO contract had authorized five days of hospital care for an appendectomy, but the HMO refused to cover more than three days. The relationship between that breach of contract and a concurrent act of malpractice might be more difficult to assess. In this case the alleged failure of the HMO is more like a negligent act than an intentional breach of a contract.

We therefore agree with the Appellate Division that it is appropriate in this case to apportion responsibility based on a breach of contract that is alleged to have proximately caused personal injury. Our jurisprudence has taken a pragmatic approach when giving effect to the conceptual differences between a breach of contract and a breach of a duty of reasonable care. *See Pickett v. Lloyd's,* 131 *N.J.* 457, 470, 621 *A.*2d 445 (1993) ("Compensation should not be dependent on what label we place on an action but rather on the nature of the injury inflicted on the plaintiff and the remedies requested."). The nature of the wrong-

doer's conduct is not particularly relevant. *See Cartel Capital Corp. v. Fireco of New Jersey,* 81 *N.J.* 548, 566–68, 410 *A.*2d 674 (1980) (explaining how there may be contribution between parties liable on entirely different bases). For example, a manufacturer liable under warranty may seek contribution from a dealer who negligently repairs an automobile. *Howell v. Bennett Buick, Inc.,* 52 *A.D.*2d 590, 382 *N.Y.S.*2d 338, 340 (App.Div.), *appeal denied,* 40 *N.Y.*2d 803, 387 *N.Y.S.*2d 1030, 356 *N.E.*2d 482 (Ct.App.1976), *cited with approval in Cartel Capital Corp., supra,* 81 *N.J.* at 568, 410 *A.*2d 674. A bank absolutely liable under a statute may seek contribution from a negligent attorney. *Tormo v. Yormark,* 398 *F.Supp.* 1159, 1188–81 (D.N.J.1975) (applying New Jersey law). A negligent supermarket may seek contribution from a manufacturer of a defective shopping cart strictly liable for a customer's injuries. *Safeway Stores, Inc. v. Nest-Kart,* 21 *Cal.*3d 322, 146 *Cal.Rptr.* 550, 554–55, 579 *P.*2d 441, 445–46 (Cal.1978), *cited with approval in Cartel Capital Corp., supra,* 81 *N.J.* at 568, 410 *A.*2d 674. The underlying principle is "that liability should be imposed in proportion to fault." *Blazovic, supra,* 124 *N.J.* at 112, 590 *A.*2d 222.

▋▋▋ The refusal to allow contribution among wrongdoers was a common-law doctrine based on a premise that has been altered by decades of changing legislative policy. Our common law evolves consonant with changes in statutory policy. *Renz v. Penn Central Corp.,* 87 *N.J.* 437, 456, 435 *A.*2d 540 (1981). Hence, we agree with the Appellate Division that in circumstances such as these "[a] breach of a contractual duty which is a proximate cause of a personal injury can easily be balanced against the negligence of another party so that their percentage responsibilities can be assessed and contribution directed as comparative fault." 271 *N.J.Super.* at 324, 638 *A.*2d 875.

### B.

▋▋▋ Although there may be contribution between one whose breach of contractual duty is a proximate cause of personal injury

and one whose negligence is a proximate cause of the same injury, a claim for contribution must be timely asserted. In *Young, supra,* 123 *N.J.* 584, 589 *A.*2d 1020, we explained how the comparative fault of an absent defendant should be treated when that party has been dismissed from the proceeding by a stipulation of settlement. We held that the existence of a cross-claim was not essential to assert a claim for a credit for the amounts due to the claimant from the dismissed defendant. We recognized that there are many strategic reasons for initially declining to prosecute a claim for contribution. Physicians, for example, "may choose to defend charges of malpractice by denying that there was any negligence at all because finger-pointing among the defendants would accrue only to the benefit of the plaintiff." *Id.* at 596, 589 *A.*2d 1020.

We emphasized, however, that a party does not have full rein to assert the claim for contribution or setoff without first providing affected parties fair and timely notice. "A litigation strategy that features surprise to the adversary is no longer tolerated." *Id.* at 597, 589 *A.*2d 1020. We were there speaking of prejudice to the plaintiffs. We see no reason why a similar standard should not apply to claims for contribution between defendants. Parties must "stake out positions among themselves" well before trial. *Id.* at 597, 589 *A.*2d 1020. In this case, Dr. Marmar did not at the time of the first trial stake out his position as to the causative fault of HCP. When the trial judge dismissed plaintiff's claims against HCP, Dr. Marmar's counsel told the court that he intended to present no evidence that HCP was independently negligent.

C.

Dr. Marmar insists that pursuant to *Rule* 4:37–2 his cross-claims were automatically reinstated when the plaintiff's case against the dismissed defendant was reinstated. However, in this case the normal procedure under *Rule* 4:37–2(c) (that would adjudicate contribution claims only after "the close of all the

evidence") was not followed. The automatic reinstatement does not follow in these circumstances. Nor does *E & K Agency, Inc. v. Van Dyke*, 60 *N.J.* 160, 286 *A.*2d 706 (1972), mandate reinstatement of the claim. In that case a nonappealing defendant benefited by an appeal by a codefendant but only because the successful appeal "eliminate[d] all basis for recovery against [the] nonappealing party." *Id.* at 163, 286 *A.*2d 706. In this case plaintiff's successful appeal did not have the same effect. The basis for relief was not congruent in each instance; plaintiff's restored claim against HCP rested on a theory of *respondeat superior* or agency; Dr. Marmar's cross-claim against HCP rested on a breach of contractual duty, a theory that he had not previously asserted.

When plaintiff appealed the dismissal of her claim against HCP, Dr. Marmar did not cross-appeal the dismissal of his cross-claims for contribution. When Dr. Marmar, after the remand, settled the claim through his insurance .company for substantially the full amount of the first verdict, he did seek to preserve the cross-claim for contribution against HCP. However, it was not until after the case had in effect been tried (because, after all, a settlement disposes of a case as does a trial) that Dr. Marmar first presented an expert report asserting HCP's independent breach of duty for failure to monitor the SJUA physicians' treatment of Carey Dunn. Had that "finger-pointing" occurred at the proper stage, it might have aided plaintiff's cause, in that a professional health-care provider agreed with her.

HCP's rather cavalier attitude in agreeing to be bound by any judgment on the remand exposed it to great peril. We acknowledge that the original trial counsel for Dr. Marmar did not articulate or abjure a claim for contribution on the contractual theory now stated (and assigned to it by plaintiff). However, the underlying factual basis for either claim is largely the same insofar as HCP is concerned: Did it have a duty to coordinate the care among its physicians? Recall how Dr. Marmar's counsel phrased its offer of proof on the remand: "[W]e have witnesses

who will show what they [HCP] didn't do and they should have done and that they were absolutely actively negligent." All the relevant facts were known at the time of the first trial. Had HCP then settled with plaintiff, would not Dr. Marmar have had the duty to set forth the factual basis for the contribution claim at such a trial?

### III

We reinstate the judgment of the trial court not because, as it thought, the Appellate Division had foreclosed its consideration of a cross-claim for contribution, but because we believe that the time to assert that claim had passed. At the time of the first trial Dr. Marmar did not stake out his position setting forth any independent claim of contributory breach of duty. In his first appeal, Dr. Marmar did not cross-appeal from the dismissal of his claim for contribution. Not until after the case had been settled, and thereby disposed of, did Dr. Marmar present the report of his expert, Dr. C. David Spencer, stating that "the coordination of care with and by the primary care physician which was empha- sized in [HCP's] * * * literature did not occur in regard to the critical steps in Mr. Dunn's case." Given the trial court's view of the Appellate Division's mandate, an earlier report would probably not have changed its view. Still, we are satisfied that the interests of justice require that such factual claims be presented at the early stages of litigation.

We reverse the judgment of the Appellate Division and rein- state the trial court's dismissal of Dr. Marmar's cross-claims against HCP.

For reversal and reinstatement Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.