988 A.2d 575 (2010)
411 N.J. Super. 596
Virginia COCKERLINE, as General Administratrix and Administratrix ad Prosequendum of the Estate of Mark Cockerline, Plaintiff-Respondent/Cross-Appellant,
v.
Erika MENENDEZ, Defendant, and
Kevin Clark and United Parcel Service, Inc., Defendants-Appellants/Cross-Respondents.
Brigitte Nguyen, Plaintiff,
v.
Erika M. Menendez, Kevin Clark, and United Parcel Service, Inc., Defendants, and
Erika M. Menendez, Defendant/Third-Party Plaintiff,
v.
Virginia Cockerline, as General Administratrix and Administratrix ad Prosequendum of the Estate of Mark Cockerline, Third-Party Defendant.
Docket No. A-4635-07T1
Superior Court of New Jersey, Appellate Division.
Argued October 6, 2009.
Decided February 4, 2010.
*579 Caryn L. Lilling (Mauro Goldberg & Lilling) argued the cause for appellants/cross-respondents (Wilson Elser Moskowitz Edelman & Dicker, and Ms. Lilling, attorneys; William Riina and Ms. Lilling, of counsel and on the brief).
*580 Elizabeth H. Hamlin argued the cause for respondent/cross-appellant (Garrity, Graham, Murphy, Garofalo & Flinn, attorneys; Ms. Hamlin, on the brief).
Karen L. Jordan, Deputy Attorney General, argued the cause for intervenor/cross-respondent State of New Jersey (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Jordan, on the brief).
Before Judges WEFING, GRALL and LEWINN.
The opinion of the court was delivered by
WEFING, P.J.A.D.
Plantiff filed a wrongful death action following the death of Mark Cockerline on January 2, 2003. The jury returned a verdict in plaintiff's favor, and the trial court entered a judgment in the aggregate amount of $2,331,536.27 against defendants Kevin Clark and his employer, United Parcel Service, Inc. ("UPS"). That sum included $1,500,000 for pain and suffering; the balance represented the jury's award for economic loss and amounts permissible under Rule 4:58, offer of judgment. Defendants Clark and UPS have appealed from that judgment. Plaintiff has cross-appealed, challenging the trial court's post-trial ruling with respect to the validity of the collateral source statute, N.J.S.A. 2A:15-97. After reviewing the record in light of the contentions advanced on appeal, we reverse the judgment and remand for further proceedings; with respect to the cross-appeal, we affirm.

I
The underlying lawsuit was filed to recover damages following the death of Mark Cockerline on the evening of January 2, 2003. The circumstances immediately surrounding Mr. Cockerline's death were unclear as the only person who may have possessed direct knowledge, Brigitte Nguyen, did not testify at trial, and she was not deposed. Her answers to interrogatories were singularly uninformative. Ms. Nguyen had filed her own action for damages, which was consolidated with this lawsuit. It was dismissed, however, when she did not appear for her deposition. Certain statements she made immediately following the accident were admissible at trial as excited utterances. N.J.R.E. 803(c)(2). That ruling is not challenged on appeal.
Ms. Nguyen was a passenger in Mr. Cockerline's car, a blue Audi, as they were driving north on the eastern spur of the Turnpike, toward Secaucus. There was testimony that it had drizzled during the day, but in the evening hours, the drizzle turned to freezing rain, making the roadway slick. At some point, in the vicinity of milepost 110, Cockerline pulled his vehicle onto the shoulder of the Turnpike, closely abutting the right-hand barrier. There was no direct testimony explaining what led Cockerline to pull his car off the roadway.
Kevin Clark was employed as a tractor-trailer driver for UPS. He was working on January 2 and picked up his last load between 7:00 p.m. and 7:15 p.m. He testified that it was drizzling as he headed out to deliver his load to the UPS facility in Secaucus and was driving in the right lane of the Turnpike at fifty to fifty-five miles per hour. He said that shortly after he picked up that load, the precipitation had turned to freezing rain, and he reduced his speed to between thirty and forty miles per hour. Clark said he was heading up a hill toward milepost 110 on the Turnpike, in the right lane, with another tractor-trailer to his left. As he crested the hill, he saw the lights of another vehicle some *581 distance ahead, and he said he applied his brakes to slow down. He said the driver of the tractor-trailer to his left did as well and that when the driver did so, that vehicle slid to its right, sideswiping the cab of Clark's UPS truck. Clark said he counter-steered to maintain control of his tractor-trailer and that the two trucks again came into contact. Clark said that because he needed both hands on the wheel to control his vehicle, he was not able to downshift. Despite his efforts, Clark was not able to stop his truck, and he hit the rear of the car he had been trying to avoid, a Honda, which was driven by Erika Menendez.
Ms. Menendez testified that she had been driving north on the Turnpike from Newark to Secaucus with her sister-in-law and her two young children, both of whom were in car seats in the rear. She said she was driving approximately thirty miles per hour because of the freezing rain and that when she came over the crest of the hill, she saw a car some distance in front of her that was perpendicular to the roadway, in her lane. She also saw another car, a blue Audi, pulled off the road and next to the barrier on the side. She testified that she thought those two vehicles had been involved in an accident and she brought her vehicle to a stop to avoid hitting the car in her lane. She was then struck in the rear by the UPS truck and pushed forward into the car that had blocked her lane. Her car was so severely damaged in this accident that it could not be repaired.[1]
Both the driver of the car that Ms. Menendez struck and the driver of the tractor-trailer that side-swiped Clark'S UPS truck, departed the scene; they were never identified. Throughout the course of the proceedings, both vehicles were referred to as phantom vehicles.
There was testimony that the UPS truck jackknifed, with its trailer going into the shoulder. Clark denied that his truck jackknifed. He said that the trailer swung to the right but did not jackknife. The trailer came to rest near Cockerline's Audi that was stopped on the shoulder.
Clark said he ran from his truck to check on the condition of the people in the Honda and that none appeared to be injured. At that point, Ms. Nguyen came up to Clark and to Joseph Fazio, a passing motorist who stopped to render assistance. Both Clark and Fazio said that Ms. Nguyen was crying and appeared distraught and that she asked them to help her find her boyfriend.
Fazio testified that Nguyen said her boyfriend had jumped over the barrier. He looked over the barrier and saw what appeared to be the body of a man. Fazio called down and received no response. He said he did not tell Ms. Nguyen what he observed but put her in a nearby car to try to calm her down.
At about that time, Trooper Michael Rohrman arrived, having been dispatched *582 in response to a call of several accidents near Turnpike milepost 110. Rohrman also testified that he was approached by a distraught Ms. Nguyen. She told him that she and her boyfriend, Mark Cockerline, had been driving home in his blue Audi when they were involved in an accident and ended up on the shoulder of the road. Their car was so close to the barrier on the right side that she could not open the passenger door. She said that Cockerline got out of the car and was standing near the headlight on the driver's side when he began to yell at her to get out of the car. Rorhman testified that Ms. Nguyen told him that she saw Cockerline move toward the barrier and then jump over it. Plaintiff established that the bridge was approximately one hundred feet from the ground at that point. Rohrman looked over the barrier and saw Cockerline lying face up on soft, marshy ground directly below the Audi and the UPS truck. He immediately summoned an ambulance.
Rohrman examined the UPS truck, Cockerline's Audi and Menendez's Honda. He saw signs that Cockerline's Audi had been sideswiped on the driver's side and that it had been damaged on the passenger's side when it came in contact with the barrier. The UPS truck had damage to the left side of the cab, in the area in which Clark said he had been sideswiped by the other tractor-trailer. The UPS truck also had damage to its front end from striking the Menendez car. The Menendez car had significant rear-end damage from being hit by the UPS truck as well as damage on its right side. No part of the UPS tractor-trailer was touching the Cockerline car, and Rohrman did not see any sign that the UPS tractor-trailer had struck the Cockerline car.
Based upon his visual inspection of the vehicles, Rohrman concluded that Menendez had slid on the ice and struck the Cockerline car and that the accident between Menendez and Cockerline occurred before the accident between Menendez and Clark. He did not believe there was any contact between Clark's truck and the Audi nor that there was any connection between Clark's truck and Cockerline's death. Because of the weather conditions, and the number of accidents at the scene, he did not take any measurements that night.
Plaintiff presented an expert on liability, Steven Schorr, a professional engineer. Although Schorr had experience in accident reconstruction, he did not qualify as an expert in that field in this case. Because of the lack of physical evidence, he was unable to reconstruct the circumstances of Cockerline's death. Schorr limited his testimony to Clark's sight distance as he approached the crest of the hill and the amount of time required for Clark to bring his truck to a halt after seeing the Menendez vehicle ahead of him. Schorr said Clark, at 100 feet from the crest of the incline, would have had a sight distance of 1,000 feet and that if he had been driving forty miles an hour, he should have been able to stop the truck within 385 to 625 feet. He also testified that if Clark had been driving thirty miles an hour, he could have brought his truck to a stop within 283 to 389 feet. Schorr did not express an opinion directly on the question of whether Clark had been negligent in his operation of the tractor-trailer. Nor did he express any opinion on whether the extent of the damage to Menendez's vehicle, or the fact that its occupants evidently were not severely injured, was an indication of Clark's speed at the time of impact.
An autopsy was performed on Cockerline. This revealed that he had multiple rib fractures, that both his femurs were broken, and that his aorta had been completely ruptured. While his skull was not *583 damaged, there was a hematoma to one portion of the brain.
Plaintiff retained Haresh G. Mirchandani, M.D., as an expert in forensic pathology. Dr. Mirchandani reviewed the results of the autopsy and issued a report in which he stated his opinion that Cockerline's legs were broken when he was struck from behind by a vehicle as he was walking. He further stated that these fractures could not have occurred as a result of a fall from such a height.
In his testimony, Dr. Mirchandani said the rupture to the aorta was caused by Cockerline's fall from such a height and that his death was the result of the internal bleeding from the ruptured aorta. He said Cockerline would survive ten to fifteen minutes before bleeding to death. He also explained that Cockerline's chest was crushed and that both his lungs were punctured, depriving him of the ability to breathe. He agreed that the resultant loss of oxygen would lead to death in a shorter time. Dr. Mirchandani explained that the femurs are the strongest bones in the body; this, combined with the fact that there were no fractures to Cockerline's ankles, shin bones or knees, led him to conclude that the fractures to the femurs were not the result of Cockerline's fall. He also testified that Cockerline, with two fractured femurs, would not have been able to move toward the barrier and jump over it.
At the time of the accident, Cockerline was married to Virginia Cockerline, and they had two children who were thirteen and twelve years old when their father died. Cockerline was separated from his wife, and the two were engaged in divorce proceedings when the accident occurred. Plaintiff's claims for economic loss thus encompassed the alimony and child support she would have received if the divorce litigation had proceeded to its anticipated conclusion, as well as the children's claims for the loss of their father's services.
The tractor-trailer that Clark was driving was equipped with an "in-vehicle information system" or "IVIS," which, among other things, recorded the vehicle's speed and brake applications. The UPS protocol called for that information to be stored on a UPS computer for thirty days unless the vehicle had been involved in a "serious" accident. In the case of a "serious" accident, the IVIS data was to be printed out and retained, and no repairs were to be made to the particular vehicle. Clark's truck was repaired several days after the accident and the IVIS data was purged after thirty days.
After the accident, plaintiff notified Cockerline's insurance carrier, Clarendon, of a claim for uninsured motorists (UM) benefits based on the actions of the phantom vehicles on the evening of January 2. When plaintiff filed her suit, she included Erika Menendez as a defendant, as well as a number of John Doe defendants. She also included a claim for spoliation of evidence and fraudulent concealment, based upon UPS's failure to retain the IVIS data.
Clarendon was given leave to intervene in this action. At some point during the pendency of the litigation, plaintiff settled her claim against Menendez. She also settled with Clarendon for UM benefits of $185,000. As part of that settlement, Clarendon agreed to forego any reimbursement from whatever recovery plaintiff might achieve in the litigation. When the matter was finally submitted to the jury, neither Ms. Menendez nor the phantom vehicles were included on the verdict sheet. After deliberations, which spanned four days, the jury returned its verdict.

II
Defendants raise a number of issues on appeal, the first group of which deal with *584 the instructions given to the jury. They contend that the trial court erred in three respects in its charge: its decision to include res ipsa loquitur; its refusal to include the question of the comparative negligence, if any, of the phantom vehicles and Menendez; and its decision to instruct the jury that it could draw an adverse inference from UPS's failure to preserve the IVIS data. For the following reasons we agree with defendants with respect to their first two contentions but not with respect to the third.

A
To prevail on a claim of negligence, a plaintiff must establish that the "defendant breached a duty of reasonable care, which constituted a proximate cause of the plaintiff's injuries." Brown v. Racquet Club of Bricktown, 95 N.J. 280, 288, 471 A.2d 25 (1984). "Ordinarily, negligence is ... `a fact which must be proved and which will never be presumed.'" Myrlak v. Port Auth. of N.Y. and N.J., 157 N.J. 84, 95, 723 A.2d 45 (1999) (quoting Meny v. Carlson, 6 N.J. 82, 91, 77 A.2d 245 (1950)).
The principle of res ipsa loquitur, however, creates "an allowable inference of the defendant's want of due care," with respect to an injury-producing occurrence, upon a showing that "(a) the occurrence itself ordinarily bespeaks negligence; (b) the instrumentality [causing the injury] was within the defendant's exclusive control; and (c) there is no indication in the circumstances that the injury was the result of the plaintiff's own voluntary act or neglect." Bornstein v. Metro. Bottling Co., 26 N.J. 263, 269, 139 A.2d 404 (1958). "The effect of the doctrine is to establish a prima facie case by permitting the jury to infer negligence." Buckelew v. Grossbard, 87 N.J. 512, 526, 435 A.2d 1150 (1981). "Res ipsa loquitur is not a theory of liability; rather, it is an evidentiary rule that governs the adequacy of evidence in some negligence cases." Myrlak, supra, 157 N.J. at 95, 723 A.2d 45 (citing Brown, supra, 95 N.J. at 288, 471 A.2d 25).
The fact that there is no explanation for an accident does not, by itself, entitle a plaintiff to invoke res ipsa loquitur. Jimenez v. GNOC Corp., 286 N.J.Super. 533, 545, 670 A.2d 24 (App.Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996). "Rather, a plaintiff has the burden of producing evidence that reduces the likelihood of other causes so `that the greater probability [of fault] lies at defendant's door.'" Ibid. (quoting Eaton v. Eaton, 119 N.J. 628, 640, 575 A.2d 858 (1990)).
"Res ipsa loquitur is grounded in probability and the sound procedural policy of placing the duty of producing evidence on the party who has superior knowledge or opportunity for explanation of the causative circumstances." Buckelew, supra, 87 N.J. at 526, 435 A.2d 1150 (citing Bornstein, supra, 26 N.J. at 269, 139 A.2d 404). This foundational premise for res ipsa loquitur rests upon one of the doctrine's elements, that the instrumentality causing the injury was within the defendant's exclusive control. Jerista v. Murray, 185 N.J. 175, 192, 883 A.2d 350 (2005); Myrlak, supra, 157 N.J. at 95, 723 A.2d 45.
At the conclusion of plaintiff's case, defendants moved for a directed verdict, contending that plaintiff had not established a prima facie case of negligence. Plaintiff opposed this motion and asserted that she had established five potential scenarios under which defendants would be liable: that Cockerline was so frightened by the UPS truck swerving toward him that he jumped over the barrier; that some portion of the UPS truck struck Cockerline directly and propelled him over the barrier; that some portion of the UPS truck hit Cockerline's Audi and pushed it into him, propelling *585 him over the barrier; that some portion of the UPS truck hit Menendez's car and pushed it into Cockerline, propelling him over the barrier; or some portion of the UPS truck hit Menendez's car and pushed it into Cockerline's car which in turn struck him, propelling him over the barrier.
During the course of the argument, the trial court ruled that there was no evidence that the UPS truck hit Cockerline or his car and it struck those theories of liability. It held that the only theories of liability supported by the evidence were that Cockerline had jumped out of fear or that the UPS truck hit Menendez's car and pushed it either into Cockerline or into his Audi. As the parties have framed the issues before us, we are not called upon to consider whether the trial court's action was correct.
Further, during the argument, the trial court concluded that plaintiff was entitled to have the jury receive a res ipsa charge. Accordingly, at the end of the case, the trial court gave the following instruction to the jury.
Now with respect to that doctrine of res ipsa loquitur. In any case in which there is a claim that the defendant was negligent, it must be proven to you that the defendant breached the duty of reasonable care which was a proximate cause of the plaintiff's injuries. Generally, the mere fact that an accident happened with nothing more does not provide proof that the accident was a result of negligence.
In a negligence case, the plaintiff must prove that there was some specific negligent act or omission by the defendant which proximately caused the accident. However, in certain circumstances the very happening of an accident may be an indication of negligence. Thus, the plaintiff may, by providing facts and circumstances, establish negligence by circumstantial evidence. If the instrumentality causing the injury was in the exclusive control of the defendant and if the circumstances surrounding the happening were of such a nature that in the ordinary course of events the incident would not have occurred if the person having control of the instrumentality had used reasonable care under the circumstances, the law permits but does not require the jury to infer negligence from the happening of the incident.
Plaintiff's voluntary act or negligen[ce] contributing to the occurrence prevents the inference from being drawn. ... The mere fact that Mark Cockerline was present, does not defeat the inference. Rather you must find that Mark Cockerline's action or negligence was a proximate cause of the occurrence to prevent an inference.
. . . .
In summary, if you find by the greater weight of the evidence that at the time of the incident the defendant had exclusive control of the instrumentality causing the occurrence, that the circumstances were such that in the ordinary course of events the incident would not have occurred if the defendant had exercised reasonable care and that the plaintiff's voluntary act or negligence did not contribute to the occurrence, then you may infer that the defendant was negligent.
If you do infer that the defendant was negligent, then you should consider the defendant's explanation of the accident. If the explanation causes you to believe that it is no longer reasonable to infer that the defendant was negligent, then the defendant is entitled to your verdict. But if giving fair weight to all of the *586 worthwhile evidence you decide that it is more likely than not that the defendant was negligent, then your verdict should be for the plaintiff.
We agree with defendant that under the evidence presented at trial, res ipsa loquitur was inapplicable because it is impossible to conclude that the instrumentality causing the injury was within defendant's exclusive control. Indeed, it is not even clear what was the instrumentality that caused the injury. Multiple factors were at work, not all of them human; a non-exclusive list includes, in addition to Clark's operation of the UPS truck: the weather; the phantom tractor-trailer that sideswiped the UPS truck, interfering with Clark's ability to bring it to a stop; and the phantom car stopped perpendicular to the flow of traffic which caused Menendez to stop in a lane of traffic.
Further, not only is it unclear from this record what led to Cockerline going over the barrier, it is also unclear when he went over the barrier. There is no evidence that he was still standing on the shoulder as Clark attempted to control his tractor-trailer and bring it to a stop. Ms. Nguyen's statements related during the trial did not include any mention of hearing or seeing a careening tractor-trailer before she saw Cockerline go over the barrier.
Plaintiff's failure to establish this critical element of the doctrine of res ipsa loquitur is fatal to its application to her case. "[B]efore the doctrine of res ipsa loquitur operates to shift the burden of persuasion to the defendant in a negligence case, the plaintiff first must meet all of the elements of the three-part res ipsa loquitur test, and ... a plaintiff's failure to prove any one of those elements by a preponderance of the evidence renders the doctrine and its concomitant burden-shifting unavailable to that plaintiff." Szalontai v. Yazbo's Sports Café, 183 N.J. 386, 389-90, 874 A.2d 507 (2005).
We are satisfied that in the context of this case, it was reversible error for the trial court to have given a charge on res ipsa loquitur. Our research has led us to two modern reported New Jersey cases in which a trial court gave a res ipsa loquitur charge in circumstances where none was warranted, and yet it was found not to be reversible error: Stackenwalt v. Washburn, 42 N.J. 15, 198 A.2d 454 (1964), and Plant v. River Road Service Co., 5 N.J.Super. 290, 68 A.2d 876 (App.Div. 1949).[2] In each case, the reviewing court concluded that it was necessary to view the charge in its entirety. 42 N.J. at 26-28, 198 A.2d 454, 5 N.J.Super. at 293, 68 A.2d 876. Only after doing so, did it conclude that the error was not prejudicial. 42 N.J. at 28-30, 198 A.2d 454, 5 N.J.Super. at 294, 68 A.2d 876.
Applying that standard to the record before us, we are unable to come to the same conclusion. The trial court instructed the jury three times with respect to the question of res ipsa loquitur. The first, as part of its overall charge, we have set forth earlier in this opinion, and it was unremarkable in its content. At the conclusion of that charge, there was a sidebar conference at which plaintiff excepted to the charge. At the conclusion of that sidebar conference, the trial court repeated its charge on res ipsa loquitur but concluded it with the following statement:
In summary, if you find by the greater weight of the evidence that at the time of the incident, the defendant had exclusive control of the instrumentality causing *587 the occurrence and that the circumstances were such that in the ordinary course of events the incident would not have occurred if the defendant had exercised reasonable care and plaintiff's voluntary act or negligence did not contribute to the accident, then you may infer that the negligence of Kevin Clark was a proximate cause of the death of Mark Cockerline.
This charge is incorrect. If res ipsa loquitur is applicable, it only permits the jury, if it deems it appropriate, to infer that a defendant was negligent. Res ipsa loquitur does not permit an inference of proximate cause, which is a wholly separate issue.
Our research has not revealed a reported New Jersey case that links the doctrine of res ipsa loquitur to proximate cause. Several other jurisdictions have rejected such a linkage, including North Dakota.
Res ipsa loquitur has no application to proximate cause and does not dispense with the requirement that the act or omission on which the defendant's liability is predicated be established as the proximate cause of the plaintiff's injury. Only after proximate cause has been established is res ipsa loquitur available to raise an inference of negligence.
[Victory Park Apartments, Inc. v. Axelson, 367 N.W.2d 155, 161 n. 4 (N.D.1985) (citation omitted) (landlord sued for damages to apartment caused by fire, which started from smoldering cigarette left in a couch; trial court erroneously charged res ipsa loquitur when it was uncertain which of three smokers was responsible).]
See also Donnelly v. Nat'l R.R. Passenger Corp. (Amtrak), 16 F.3d 941, 946 (8th Cir. 1994) (plaintiff alleged defendant was negligent in not locking doors to train from which plaintiff's decedent fell; res ipsa loquitur would not establish proximate cause); Martin v. City of Washington, 848 S.W.2d 487, 495 (Mo.1993) ("[R]es ipsa loquitur carries the plaintiff over the breach hurdle. It cannot, however, leap over the causation hurdle."); Downs v. Longfellow Corp., 351 P.2d 999, 1006 (Okla.1960) ("[I]t is negligence, not causation, that is inferred under the doctrine [of res ipsa loquitur]."); J.D. Lee & Barry A. Lindahl, Modern Tort Law § 15.20 (rev ed. 1994) ("Res ipsa loquitur, where applicable, will only supply evidence of negligence, and not of causation.").
During the course of the jury's deliberations, it asked several questions, one of which requested the definition of proximate cause. The trial court responded by repeating the definition of proximate cause it had originally provided to the jury. It then went on to again instruct the jury on the concept of res ipsa loquitur, again telling the jury that if they found that Clark had "exclusive control of the instrumentality," that "the incident would not have occurred if Kevin Clark had exercised reasonable care," and that plaintiff's actions did not contribute to the occurrence, "you may infer that the negligence of Kevin Clark was a proximate cause of the death of Mark Cockerline."
Erroneous instructions constitute reversible error "only if the jury could have come to a different result had it been correctly instructed." Victor v. State, 401 N.J.Super. 596, 617, 952 A.2d 493 (App. Div.2008) (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18, 800 A.2d 826 (2002)). In this matter, proximate cause was a critical issue. Absent such an instruction, it is entirely conceivable that this jury could have come to a different result. This instruction had the clear capacity to affect the jury's deliberations, and defendants are entitled to a new trial.

*588 B
Because this matter must be retried, we consider the balance of defendants' arguments with respect to the trial court's instructions for its guidance in any future proceedings. We agree with defendants that the trial court erred when it deprived them of their statutory right to seek an apportionment of negligence from the "John Doe" defendants named in place of the drivers of the phantom car and phantom truck. Defendants also contend that the trial court erred when it did not permit them to seek such apportionment from the former co-defendant Menendez. The record does not support this latter contention.
New Jersey's comparative fault system is intended to ensure "the distribution of loss `in proportion to the respective faults of the parties causing that loss.'" Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 114, 853 A.2d 940 (2004) (quoting Blazovic v. Andrich, 124 N.J. 90, 107, 590 A.2d 222 (1991)). N.J.S.A. 2A:15-5.2(a) provides that in all negligence actions in which liability is disputed, the trier of fact must decide the "extent in the form of a percentage, of each party's negligence or fault." A defendant will only be held responsible for that portion of the verdict corresponding to its own percentage of fault, provided it is less than sixty percent. N.J.S.A. 2A:15-53.
A "non-settling defendant has the right to have a settling defendant's liability apportioned by the jury." Mort v. Besser Co., 287 N.J.Super. 423, 431, 671 A.2d 189 (App.Div.1996), certif. denied, 147 N.J. 577, 688 A.2d 1053 (1997). "When one defendant settles, the remaining codefendant or codefendants are chargeable with the total verdict less that attributable to the settling defendant's percentage share." Cartel Capital Corp. v. Fireco of N.J., 81 N.J. 548, 569, 410 A.2d 674 (1980). The right of a non-settling defendant to have the jury apportion the liability of a settling defendant is dependent upon the non-settling defendant proving the liability of the settling defendant. Green v. Gen. Motors Corp., 310 N.J.Super. 507, 545-46, 709 A.2d 205 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998). The fact of settlement does not prove the liability of the settling defendant. Mort, supra, 287 N.J.Super. at 431-32, 671 A.2d 189.
We noted earlier in our opinion that plaintiff settled her UM claim, based upon the phantom vehicles, for $185,000. In pretrial motions, the trial court ruled that defendants were not entitled to have the jury apportion any fault to the phantom vehicles, and they were not included on the verdict sheet or addressed in the court's instructions.
Both parties find support for their respective positions in Riccio v. Prudential Property and Cas. Ins. Co., 108 N.J. 493, 531 A.2d 717 (1987), by using portions of the Court's language to their liking and disregarding those portions that are unfavorable. We agree with plaintiff that defendants are incorrect when they assert that Clarendon, by settling the UM claim, "stepped into" the shoes of the phantom vehicles. The Riccio Court specifically rejected such an analysis, noting that UM coverage is a matter of contract between the insured and his carrier. Id. at 498-99, 531 A.2d 717. In our judgment, however, plaintiff is incorrect when she urges that Riccio stands for the proposition that a tortfeasor is not entitled to benefit from UM coverage for which it paid no premium.
Rather, the Riccio Court noted that the law governing UM coverage and the law governing comparative negligence and contribution among joint tortfeasors serve different goals and purposes. Id. at 503, 531 A.2d 717. The UM "statute was *589 designed to provide maximum remedial protection to the innocent victims of financially irresponsible motorists and to reduce the drain on the financially-troubled Unsatisfied Claim and Judgment Fund." Id. at 503-04, 531 A.2d 717. Its purpose "is to make the victim whole, but not provide a windfall or to allow a double recovery. ..." Id. at 504, 531 A.2d 717.
"The policy behind the Joint Tortfeasors Contribution Law and the Comparative Negligence Act, on the other hand, is quite different. It is one of equity among joint tortfeasors  that is, those responsible for injury to an innocent victim should share equally the burden of recompense. The purpose is to relieve tortfeasors of an injustice among themselves."
[Id. at 504, 531 A.2d 717 (citation omitted).]
In our judgment, to preclude defendants from seeking an apportionment of liability against the phantom vehicles does not advance the purposes of the UM law and frustrates the purposes of the joint tortfeasor and comparative fault law. The trial court erred when it precluded the jury from making such an apportionment.
One final aspect of defendants' argument must be noted. They contend that the trial court should also have included on the verdict sheet the question of what proportion of negligence, if any, should be attributed to Menendez. If that were the only question presented on appeal with respect to apportionment, we would decline to reverse because a fair reading of the transcript indicates a decision by defense counsel not to pursue that issue. We do not determine whether that decision would preclude a different analysis in a subsequent trial.

C
We turn now to the question whether the trial court erred in the manner in which it dealt in its instructions with the defendants' failure to preserve the IVIS data.[3] The trial court gave the following instruction to the jury:
The intentional destruction of evidence relevant to proof of an issue at trial gives rise to an inference unfavorable to the party who destroyed or concealed the evidence.
If you should find that the defendant, UPS, destroyed or concealed evidence, you may presume that the evidence destroyed or concealed would have been unfavorable to UPS. In this case, Kevin Clark. Whether or not an adverse inference should be drawn is for your determination.
"Spoliation of evidence in a prospective civil action occurs when evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and disposition." Aetna Life & Cas. Co. v. Imet Mason Contractors, 309 N.J.Super. 358, 364, 707 A.2d 180 (App.Div.1998) (quoting Hirsch v. Gen. Motors Corp., 266 N.J.Super. 222, 234, 628 A.2d 1108 (Law Div.1993)). The existence of a duty to preserve evidence is a question of law to be determined by the court. Manorcare Health Servs., Inc. v. Osmose Wood Preserving, Inc., 336 N.J.Super. 218, 226, 764 A.2d 475 (App.Div.2001). Such a duty arises when there is pending or likely litigation between two parties, knowledge of this fact by the alleged spoliating party, evidence relevant to the litigation, and the foreseeability that the opposing party would be prejudiced by the destruction or disposal of this evidence. Aetna Life, supra, *590 309 N.J.Super. at 366, 707 A.2d 180 (citing Hirsch, supra, 266 N.J.Super. at 250-51, 628 A.2d 1108).
Various civil remedies have been developed with the intent of making "whole, as nearly as possible, the litigant whose cause of action has been impaired by the absence of crucial evidence; ... punish[ing] the wrongdoer; and ... deter[ring] others from such conduct." Rosenblit v. Zimmerman, 166 N.J. 391, 401, 766 A.2d 749 (2001). Depending on the circumstances, spoliation can result in dismissal, a separate tort action for fraudulent concealment, discovery sanctions, or an adverse trial inference against the party that caused the loss of evidence. Jerista, supra, 185 N.J. at 201, 883 A.2d 350; Aetna Life & Cas. Co., supra, 309 N.J.Super. at 368-69, 707 A.2d 180.
The selection of the appropriate sanction is left to the trial court's discretion and will not be disturbed if it is "just and reasonable in the circumstances." Hirsch, supra, 266 N.J.Super. at 260-61, 628 A.2d 1108 (quoting Lang v. Morgan's Home Equip. Corp., 6 N.J. 333, 339, 78 A.2d 705 (1951)). An appropriate sanction is one that properly takes into account the spoliator's level of intent, and is adequate and effective, but not excessive. Manorcare Health Servs. Inc., supra, 336 N.J.Super. at 226, 230-31, 764 A.2d 475).
"The spoliation inference permits the jury to infer that the evidence destroyed or concealed would not have been favorable to the spoliator." Jerista, supra, 185 N.J. at 202, 883 A.2d 350 (citing Rosenblit, supra, 166 N.J. at 401-02, 766 A.2d 749). If a plaintiff can make a threshold showing that a defendant's recklessness caused the loss of relevant evidence, the jury should be so instructed. Jerista, supra, 185 N.J. at 203, 883 A.2d 350. The jury is free, however, to accept or reject the inference. Ibid. "Needless to say, if the jury were to accept defendant's account, the spoliation inference would be rejected." Ibid.
Defendants argue first that the trial judge erred in administering an adverse inference charge, rather than simply imposing a monetary sanction, where: (1) there was no evidence that IVIS data was destroyed with an intent to conceal, and (2) plaintiff was not prejudiced by the absence of the IVIS data.
Our review of the record does not indicate that defendants ever sought a lesser sanction. In any event, contrary to defendants' first representation, plaintiff presented evidence that UPS allowed the IVIS data to be purged even though it usually looked at the data even in the case of a minor accident. Menendez's car was totaled, UPS had some concerns about Clark's possible liability vis-á-vis decedent's death, and UPS was made aware of plaintiff's claims while Menendez's claim was still pending.
We also cannot agree with defendants' further contention that proof of Clark's speed and braking was not crucial where: (1) plaintiff had almost no evidence from which to reconstruct this accident, (2) Clark's estimates of his speed varied, and (3) the IVIS data might have undercut Clark's claims that he was unable to brake after being sideswiped by a phantom truck.
Next, defendants argue that the trial judge erred in "permit[ting] the plaintiff to explore what happened to the [IVIS] data in front of the jury." Contrary to defendants' representations, there was no way the jury could have assessed plaintiff's entitlement to the inference in a vacuum. Rather, as noted above, the jury had to pick between the parties' accounts of how and why the evidence was lost in deciding *591 whether to accept or reject the spoliation inference. We reject defendants' contention that the lower court committed reversible error in administering an adverse inference charge.

III
Included in the remainder of defendants' arguments on appeal are challenges to various aspects of the damages awarded by the jury. In light of our determination that the matter must be retried, we do not address those contentions. Nor do we address defendants' argument that the trial court erred in precluding them from presenting two of their proposed experts. That is an issue that may be taken up with the trial court in the course of preparing for the second litigation.
We deem it necessary, however, to address one remaining argument by defendants, that the trial court, in settling the form of judgment, erred when it did not reduce plaintiff's award by the amounts of the social security survivor and death benefits and the PIP death benefit that she received. We are satisfied defendants are correct.
Following decedent's death, plaintiff received approximately $128,295 in social security death and survivor benefits pursuant to 42 U.S.C.A. § 402(d) and (g). She also received $10,000 in death benefits from Clarendon pursuant to her PIP insurance coverage.
In response to defendants' post-trial request for a set-off, plaintiff's counsel argued that plaintiff's receipt of these benefits did not require a reduction in her award pursuant to the collateral source statute, N.J.S.A. 2A:15-97. Specifically, plaintiff's counsel maintained that the availability of the social security benefits was not contingent on employment, and that these benefits were really akin to life insurance, which is exempted under the statute. Plaintiff's counsel also argued that the social security benefits did not duplicate any part of the award because the jury awarded alimony and child support, not lost income. Lastly, counsel argued that the PIP benefits were like life insurance because they were payable to plaintiff simply by virtue of decedent's death provided he was working. The trial court adopted this argument.
Pursuant to N.J.S.A. 2A:15-97:
In any civil action brought for personal injury or death, ... if a plaintiff receives or is entitled to receive benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor, the benefits, other than workers' compensation benefits or the proceeds from a life insurance policy, shall be disclosed to the court and the amount thereof which duplicates any benefits contained in the award shall be deducted from any award recovered by the plaintiff, less any premium paid to an insurer directly by the plaintiff or by any member of the plaintiff's family on behalf of the plaintiff for the policy period during which the benefits are payable.
The primary purpose of N.J.S.A. 2A:15-97, which abrogated the common law collateral source rule, is to "disallow double recovery to plaintiffs." Perreira v. Rediger, 169 N.J. 399, 410, 778 A.2d 429 (2001), overruled on other grounds by Levine v. United Healthcare Corp., 402 F.3d 156 (3d Cir.), cert. denied, 546 U.S. 1054, 126 S.Ct. 747, 163 L.Ed.2d 611 (2005). Benefits the Legislature intended to cover by the statute include "those `from ... health insurance policies, from employment contracts, from statutes such as ... the Federal Employers' Liability Act, from gratuities, from social legislation such as social security and welfare, and from pensions under special retirement *592 acts.'" Woodger v. Christ Hosp., 364 N.J.Super. 144, 151, 834 A.2d 1047 (App.Div.2003) (quoting Kiss v. Jacob, 138 N.J. 278, 282, 650 A.2d 336 (1994)). Social security disability payments are also included to the extent they are "neither contingent nor speculative nor subject to change or modification." Woodger, supra, 364 N.J.Super. at 151, 834 A.2d 1047 (citing Parker v. Esposito, 291 N.J.Super. 560, 565-66, 677 A.2d 1159 (App.Div.), certif. denied, 146 N.J. 566, 683 A.2d 1162 (1996)).
Defendants argue first that, contrary to the lower court's ruling, social security survivor and death benefits are not excluded from N.J.S.A. 2A:15-97. We agree.
The statute does not exempt death benefits that are "similar to" life insurance. It exempts "proceeds from a life insurance policy." Adopting plaintiff's construction would require us to ignore the clear language of the statute. This we cannot do.
Plaintiff relies upon the case of Krum v. Green Island Constr. Co., 671 N.Y.S.2d 563 (App.Div.1998). However, in that case, the social security benefits received by the decedent's widow under 42 U.S.C.A. § 402(e) and excluded under New York's collateral source statute as insurance, were expressly denominated by the Social Security Administration as "`Life Insurance' from Social Security." Id. at 564. Additionally, we cannot agree with plaintiff that it makes any difference that her award consisted of alimony and child support rather than the more "traditional" award of the decedent's lost earnings, since both compensate for the loss of "monetary contributions which the decedent reasonably might have been expected to make to the survivors." Curtis v. Finneran, 83 N.J. 563, 570, 417 A.2d 15 (1980); see also Tash v. Tash, 353 N.J.Super. 94, 103, 801 A.2d 436 (App.Div.2002) (social security death benefits are "designed to replace monies which would or could have been earned" by the deceased parent had he or she survived).
Defendants also argue that the lower court erred in failing to reduce plaintiff's award by the amount of the PIP death benefit she received because this benefit was also intended to replace lost income. In response, plaintiff acknowledges that the PIP benefit was intended to replace lost income, but insists only that "[t]here is no correspondence" between this benefit and any item of damage awarded by the jury. In plaintiff's view, "[t]he decedent's lost income was not recovered by anyone" since the awards here were for alimony and child support. Plaintiff is drawing too fine a distinction. The support awards she received were based upon the income decedent would have earned had he not been killed. Any judgment entered should reflect this PIP benefit.

IV
We turn now to plaintiff's cross-appeal, which also revolves around the relationship between N.J.S.A. 2A:15-97 and federal law.
In her cross-appeal, plaintiff contends that N.J.S.A. 2A:15-97 is invalid under federal law. In accordance with Rule 4:28-4, plaintiff notified the Attorney General of her challenge, and the State of New Jersey was permitted to intervene with respect to that issue. We question whether this is properly the subject of a cross-appeal, as opposed to the proffer of an additional basis upon which plaintiff contends we should affirm the decision of the trial court that the final judgment need not reflect the social security survivor and death benefits due to plaintiff as a consequence of Cockerline's death. We elect, in *593 any event, to deal briefly with the substance of the question.
The essence of plaintiff's argument is that our collateral source statute is invalid because it has been pre-empted by the Employee Retirement Income Security Act of 1974 ("ERISA") § 514, 29 U.S.C.A. § 1144(a), and, alternatively, because it is prohibited by the anti-assignment clause of the Social Security Act § 207, 42 U.S.C.A. § 407.
In support of her first proposition, plaintiff relies upon Levine v. United Healthcare Corp., supra, 402 F.3d at 156. In our judgment, Levine does not lead to the result plaintiff advocates.
The plaintiffs in Levine had each suffered damages for which they brought third-party actions. Id. at 159. When those actions were settled, the plaintiffs reimbursed their health insurers for the amounts the insurers had paid toward the medical expenses plaintiffs had incurred because their health insurance policies had provisions calling for such reimbursement, in accordance with then-existing N.J.A.C. 11:4-42.10. Id. at 159-60. Several years later, the New Jersey Supreme Court in Perreira v. Rediger, supra, invalidated that regulation. Based upon the Court's opinion in Perreira, the plaintiffs in Levine brought suit to recover the sums they had earlier reimbursed the insurers. Id. at 160.
As part of their defense to this action, the plaintiffs' insurers argued that the plaintiffs' claims were preempted by ERISA. Ibid. The court went through a detailed analysis, eventually concluding that plaintiffs were suing for benefits due under health insurance plans governed by ERISA, that as a consequence their claims "related" to ERISA-governed plans and were thus preempted by ERISA's provision barring such suits. The court ruled that to the extent N.J.S.A. 2A:15-97 precluded reimbursement to health insurers for amounts paid pursuant to benefit plans governed by ERISA, it was preempted. The court remanded the matter to the District Court with instructions that plaintiffs' claims be dismissed. Id. at 166-67.
We disagree with plaintiff's contention that the result of Levine was to invalidate N.J.S.A. 2A:15-97 in its entirety. The premise of plaintiff's argument rests on the fact that N.J.S.A. 2A:15-97 does not contain a severability clause. None is needed, however. "Where the principal object of the statute is constitutional, and the objectionable provision can be excised without substantial impairment of the general purpose, the statute is operative. ..." Exxon Corp. v. Hunt, 109 N.J. 110, 117, 534 A.2d 1 (1987) (quoting State ex rel. McLean v. Lanza, 27 N.J. 516, 528, 143 A.2d 571 (1958)). Nothing within Levine affected the continued viability of the statute's dual purposes of precluding a plaintiff from receiving a double recovery and relieving economic pressure on liability carriers.
We also reject the second portion of plaintiff's argument, that N.J.S.A. 2A:15-97 is invalid because it conflicts with the anti-assignment clause of the federal social security law. This statute provides:
The right of any person to any future payment under this title shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this title shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.
[Social Security Act § 207(a), 42 U.S.C.A. § 407(a).]
This anti-assignment provision is "directed at traditional types of assignments, whereby a recipient relinquished a portion of the *594 federal benefits." Lamb v. Conn. Gen. Life Ins. Co., 643 F.2d 108, 111 (3d Cir.), cert. denied, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981) (citing Hurd v. Ill. Bell Tel. Co., 136 F.Supp. 125 (N.D.Ill.1955), aff'd, 234 F.2d 942 (7th Cir.), cert. denied, sub nom. Seybold v. W. Elec. Co., 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 (1956)).
In Thomas v. Toys "R" Us, Inc., 282 N.J.Super. 569, 577, 660 A.2d 1236 (App. Div.), certif. denied, 142 N.J. 574, 667 A.2d 191 (1995), the trial court molded the plaintiff's verdict in accordance with N.J.S.A. 2A:15-97 by allowing the defendant a set-off in the amount of the social security benefits plaintiff had received. On appeal, the Thomas court rejected the plaintiff's argument that the provisions of the Social Security Act preempted the State "from reducing an injured person's social security benefits by a tort award." Id. at 589, 660 A.2d 1236. While the preemption argument in Thomas was specifically premised upon 42 U.S.C.A. § 424(a), the Act's "offset" provision, rather than section 407(a), the court's reasoning is equally applicable in this case:
The amount of social security benefits received by plaintiff has not been diminished by State law. Plaintiff has received and will continue to receive whatever social security benefits federal law and regulations permit. The State law under review, N.J.S.A. 2A:15-97, simply does not permit a plaintiff to duplicate those benefits through a tort award. Thus, there is no conflict between state and federal law. [Plaintiff's] social security benefits have not been set off or diminished by State actions.
[Thomas, supra, 282 N.J.Super. at 589, 660 A.2d 1236 (citations omitted).]
Although, as we have earlier indicated, the trial court erred when it did not credit defendants with the social security benefits plaintiff received, it was correct when it rejected plaintiff's claim of preemption.

V
On defendants' appeal, the judgment under review is reversed, and the matter is remanded to the trial court for further proceedings. On plaintiff's cross-appeal, the trial court's ruling that N.J.S.A. 2A:15-97 is not preempted by federal law is affirmed.
NOTES
[1] The description Ms. Menendez gave at trial varied from the description she provided in her answers to plaintiff's interrogatories, which are included in the record before us. There she stated that she had been driving

in the center lane and another vehicle which was later determined to have been operated by Mark R. Cockerline was in the right lane. Our vehicles slid on ice and we sideswiped each other. My vehicle stopped in the center lane and Mr. Cockerline's vehicle slid into the shoulder and struck the right shoulder barrier. Shortly thereafter I was struck in the rear by a truck later determined to have been operated by defendant, Kevin Clark, and owned by defendant, UPS. I was pushed towards the right lane and right shoulder and the truck came to a stop behind me, also in the right shoulder and right lane.
When Ms. Menendez testified at trial, however, she was not confronted with this interrogatory answer, and it was not offered into evidence.
[2] We note for the sake of completeness O'Connor v. Adekman, 96 N.J.L. 537, 540, 115 A. 369 (E. & A. 1921), in which the Court of Errors and Appeals reversed a judgment because the trial court erroneously applied the principles of res ipsa loquitur.
[3] Plaintiff's claim of fraudulent concealment based upon loss of Clark's IVIS data was severed prior to trial and dismissed after the jury returned its verdict.