**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0806-23

THE ESTATE OF JOAN
BERKELEY,  deceased,

  Plaintiff-Appellant,

v.

AMC ENTERTAINMENT
HOLDINGS, INC., AMC
THEATRES, AMC LOEWS,
and AMC LOEWS, BRICK
PLAZA 10,

  Defendants-Respondents.

_____

    Argued March 27, 2025 – Decided April 16, 2025

    Before Judges Mawla and Natali.

    On appeal from the Superior Court of New Jersey, Law
    Division, Middlesex County, Docket No. L-0778-17.

    Charles C. Berkeley argued the cause for appellant.

    Catherine De Angelis argued the cause for respondents
    (Weber Gallagher Simpson Stapleton Fires & Newby
    LLP, attorneys; Catherine De Angelis and Rafael A.
    Soto, on the brief).

PER CURIAM

After a jury returned a no cause of action verdict with respect to plaintiff's negligence-based complaint, plaintiff filed this appeal challenging a November 30, 2018 order that denied its motion to amend the complaint to include a count for fraudulent concealment, a related request for an adverse spoliation inference charge at trial, and a January 11, 2019 order that denied plaintiff's motion for reconsideration. Having considered the record in the context of our standards of review and the substantive legal principles, we affirm.

I.

On August 13, 2016, Joan Berkeley[1] tripped and fell at an AMC Loews movie theater in Brick causing her to sustain "severe and permanent injuries." According to the guest incident report authored by her son, Charles,[2] who witnessed the incident, his mother "fell walking down [the] left side of theater five at [the] first step down before the movie began at approximately 8[:]00 p[.]m[.,]" sustaining an "injury to [her] right eye and right shoulder."

---

[1] Plaintiff passed away during the litigation and is now represented by her estate.

[2] Because Joan and her son share a common surname, we refer to them by their first names and intend no disrespect.

2

According to the AMC incident report authored by its employee Brianne Taylor Owen, an "elderly guest came out with her son after [the movie] to let [Owen] know that while walking on the left side of the auditorium to a seat during the trailers[,] . . . she had fallen down the step and onto her face." After conducting an inspection of the area where Joan fell, Owen checked the lights on the steps and stated they were all "fully lit and the lights in the auditorium itself were at trailer level and in working order as well."

Less than three weeks later, on September 1, 2016, Joan's then attorney sent AMC a letter alleging her injuries were caused by defendants' negligence. Specifically, counsel maintained

> the incident occurred as a result of the improper actions of the theater in question relative to its design, maintenance[,] and control at the time the incident occurred. Despite the fact that there was no movie showing . . ., the theater was unlit with the exception of inadequate lighting[,] which caused [Joan] to fall and sustain serious injuries to her right eye.

Counsel did not specifically request defendants maintain or preserve any documents related to the incident. Approximately five months later, Joan filed a negligence-based complaint against defendants. Defendants answered, denied liability, and asserted various affirmative defenses.

A-0806-23

In response to Joan's request for admissions, defendants admitted the playback of commercial advertisements and dimming of lights in its theaters is automatically controlled by the Theater Management System (TMS), but denied there existed any issue with either the automatic playback of commercial advertisements or the lighting system. Further, in response to plaintiff's interrogatories, defendants stated the "TMS was reviewed by AMC Brick Plaza [Ten] theater personnel following [Joan's] alleged incident and showed that all cues played; TMS does not retain information dating as far back as August 13, 2016."

Deposition discovery provided further details about the incident. With respect to the lighting in the theater at the time of the incident, Charles testified "[t]he only lights [he] noticed were the first place [he] looked to sit was the balcony and [he] saw blue lights [he] guess[ed] at seat level[,] which . . . were eye level as [he] walked in. It was dark. And dim floor lighting." Specifically, Charles noticed yellow lights on either side of the aisle and lights on the stairs.

Joan testified the theater was "pitch black. It[ was] like walking into a closet. There [were] no lights overhead at all, nothing on the screen." She further explained, however, while walking through the theater she "saw little blue lights . . . and there was . . . a glow on the floor[,] which were more lights."

4

Kristen Puff, a part-time AMC employee who was responsible for "ushering, concession, box office sales, [and] customer service" at the time of the incident, testified she would receive complaints about lights in the theater being off when they should be on approximately "once or twice a month." Owen similarly testified at her deposition there were times when the ceiling lights remained off when they were supposed to be on due to a "cue issue."

With respect to the TMS, Hemil Patel, an AMC usher, explained the TMS generates "automated errors from the projectors. So[,] they come straight to the . . . error section which is an error log. . . . There[ are] various errors that happen. It could range from a show is not playable . . . [to] some sort of disconnect." Patel further testified, however, he did not know what logs the TMS generates, and he was only familiar with general error reports.

Katherine A. Higgins, the General Manager of AMC Brick in March 2017, who was not present at the theater during Joan's alleged incident, also testified at her deposition about the TMS. She estimated the TMS logs are automatically purged after three weeks.

On October 24, 2018, plaintiff filed a motion seeking leave to amend its complaint to include a count for fraudulent concealment. Additionally, plaintiff

A-0806-23

sought "[t]he entry of an [o]rder providing [it] with the benefit of an adverse inference charge at the time of the trial of this matter."

In its proposed amended complaint, plaintiff alleged the following with respect to its allegation of fraudulent concealment: (1) defendants had a legal obligation to disclose the TMS logs from August 13, 2016; (2) those logs were material to plaintiff's litigation because the TMS "software failed to operate properly in controlling the level of the ceiling lights in [a]uditorium [five], rendering the lighting in [a]uditorium [five] inadequate and unsafe, and that this was the proximate cause of the plaintiff's accident"; (3) plaintiff could not reasonably obtain the TMS logs from another source; (4) defendants "intentionally withheld or destroyed the [TMS logs] with purpose to disrupt the underlying litigation"; and (5) plaintiff suffered damages because it had to retain a software expert to review the TMS logs supplied by DCIP[3] but those logs, unlike the logs retained by defendants, "do not record errors involving the automatic operation of the ceiling lighting."

Defendants opposed plaintiff's motion and relied upon the affidavit of Trevor Hart, AMC's Director of Technical Operations Center. Hart explained

---

[3] "DCIP" stands for Digital Cinema Implementation Partners, LLC, which "leases AMC the equipment for the digital projection of its movies and maintains unfiltered log data required by its distributors."

6

the TMS "is a scheduling system that is primarily concerned with whether the schedule got created as opposed to accurately showing that the equipment did what was asked." He further clarified

> [t]he logs that the TMS creates were developed by the company that made the TMS, for their own purposes. When AMC builds a schedule, it builds a Show Play List . . . which includes the pre-show content which starts [twenty to thirty] minutes before a movie, the trailers[,] and the movie. The TMS digital cinema equipment has a schedule[,] which will execute[,] and the TMS asks whether the [Show Play List] was executed.

Hart explained "the TMS software automatically deletes the logs after eight days."

In addition to the Hart affidavit, defendants also submitted an affidavit from Pete Lude, a digital cinema software expert and the Chief Technical Officer for Mission Rock Digital, LLC.[4] Lude explained "[t]he [s]ecurity [l]og, [p]erformance [l]og[,] and [e]vent [l]og . . . are the functional equivalent of the [TMS] log . . . . The TMS is the software that allows the ingest of material (moving the digital file of a new movie into the local storage) and scheduling between all auditoriums . . . ." Lude further stated the TMS "would not include

---

[4] Mission Rock Digital, LLC, is "a San Francisco-based consultancy in advanced media technology."

A-0806-23

useful information" because it contains scheduling information, it does not "contain an accurate representation of when something actually played at a given auditorium." Rather, according to Lude, the "gold standard" for determining whether an action occurred is the security log because it "is the only log system designed to precisely record the start and stop times of actual events."

After considering the parties' written submissions and oral arguments, the court denied plaintiff's application for leave to amend the complaint and for a spoliation charge, issued a conforming order, and explained its decision in an oral decision. The court summarized plaintiff's application as "tantamount to a spoliation count" that would not survive a motion to dismiss. It further observed, "[f]or the first[-]time plaintiff claims that AMC destroyed the [TMS] logs, which would have provided evidence probative to whether the trailer . . . was played before the movie and, thereby, was probative of the issue of liability."

According to Hart's affidavit, however, "the software was set to automatically delete the logs after eight days of recording that day's event." The court further explained the guest incident report completed by Charles made "no mention of lighting or that the movie trailer failed to play as a factor in plaintiff's fall[,]" and the September 1 letter was served after the logs had already been

8

automatically deleted. It also noted "plaintiff obtained via subpoena from DCIP the security logs, performance logs, and events logs."

The court next rejected plaintiff's argument the guest incident report and September 1 letter apprised defendants of the likelihood of litigation and thereby required them to preserve the TMS logs. With respect to the guest incident report, the court found it did not put defendants on notice to preserve the TMS logs because it "merely state[d] and apprised [defendants] of the likelihood of litigation but ma[de] no mention of lighting or that the movie trailer failed to play as a factor in plaintiff's fall. Nor [did the] report include any request to preserve the TMS logs for the [August 13, 2016] date."

The court further rejected plaintiff's argument the September 1 letter put defendants on notice to preserve the TMS logs because the "letter came only after the TMS software had already deleted the logs as a result of the software's retention directive[,] which was only eight days." It also found the testimony of other AMC employees who estimated the retention period of the TMS logs as three weeks did not create a genuine and material factual issue because "the Director of Technical Operations would have knowledge as to the actual retention policy of that particular log in the software."

A-0806-23

Significantly, the court further found plaintiff was not prejudiced by the unavailability of the TMS logs. The court explained plaintiff received the security log, performance log, and event log from DCIP, and as a result "both experts would be put in the same footing because neither of them reviewed the [TMS] logs." And because plaintiff obtained these other logs from DCIP that "provide[d] essentially the same information sought by . . . plaintiff, it [did] not appear that the [TMS] logs['] . . . probative value would outweigh the undue prejudice that would be done if [the court] were to grant the amended [c]omplaint."

Plaintiff subsequently filed a motion for reconsideration on December 24, 2018. By order dated January 11, 2019, the court denied plaintiff's application and explained its decision in an accompanying statement of reasons. Applying the reconsideration standard as set forth in D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990), the court found plaintiff "fail[ed] to establish that th[e c]ourt ha[d] based its decision on a palpably incorrect or irrational basis or that it had failed to consider or appreciate the significance of the probative evidence." The court further explained plaintiff merely reiterated the same arguments it had presented on its original motion to amend the complaint.

A-0806-23

Although plaintiff maintained the court failed to address its request for an adverse inference charge at trial, the court explained it "found that the request for an adverse inference charge [was] moot pursuant to the denial of the [m]otion to [a]mend the [c]omplaint." Nevertheless, citing R.L. v. Voytac, 402 N.J. Super. 392, 406 (App. Div. 2008), the court further found "[p]laintiff fail[ed] to meet the four-part test for the application of a spoliation inference" charge because it had found defendants "did not actually suppress or withhold such evidence, nor that it was relevant." As noted, the matter proceeded to trial and the jury returned a verdict of no cause for plaintiff.[5]

## II.

Before us, plaintiff contends the court erred in denying its motion to amend and for reconsideration. First, plaintiff argues defendants had a legal duty to preserve the TMS logs because: (1) the guest incident report authored by Charles "apprise[d defendants] of the likelihood of litigation"; (2) defendants were advised of the likelihood of litigation by way of the guest incident report and the September 1 letter; (3) plaintiff was prejudiced by the destruction of the TMS logs because it "was denied the opportunity to examine the logs . . . to determine the validity of the [defendants'] findings that there were no errors in

---

[5] The appellate record does not include the trial transcripts.

the operation of the [TMS] software"; and (4) "the adequacy and safety of the lighting in [the] [a]uditorium at the time of . . . plaintiff's accident . . . is a central issue in this case." Relying upon our Supreme Court's decision in Rosenblit v. Zimmerman, 166 N.J. 391, 406-07 (2001), plaintiff maintains it "should [have been] permitted to amend [its] complaint to include a count for fraudulent concealment."

Second, plaintiff argues "it was improper for the court to decide . . . plaintiff's motion to amend the complaint to include a count for fraudulent concealment as if it were a motion for summary judgment under R[ule] 4:46." Specifically, plaintiff contends the court's decision contravened Printing Mart-Morristown v. Sharp Electronics Co., 116 N.J. 739, 746 (1989), by "consider[ing] extraneous information gleaned from the parties' certifications, which effectively converted . . . plaintiff's motion to amend the complaint to a motion for summary judgment under R[ule] 4:46."

Plaintiff next argues the court erred in considering that the guest incident report failed to ascribe the incident to inadequate lighting, or the failure of the commercial advertisement to play. It asserts those facts are not relevant to any of the elements of the fraudulent concealment claim nor is the fact plaintiff failed to specifically request defendants preserve the TMS logs. Additionally,

plaintiff maintains the court erred in finding "as fact that the logs self-deleted after eight days," despite the testimony from defendants' employees those logs were retained for approximately three weeks. Plaintiff argues because it had to retain an expert to review the logs provided by DCIP due to defendants' alleged failure to retain the TMS logs, its "expenditure of funds on a software expert is compensable as damages under the fraudulent concealment claim."

## III.

"We review a trial court's decision to grant or deny a motion to amend the complaint for abuse of discretion." Grillo v. State, 469 N.J. Super. 267, 275 (App. Div. 2021) (quoting Port Liberte II Condo. Ass'n, Inc. v. New Liberty Residential Urb. Renewal Co., 435 N.J. Super. 51, 62 (App. Div. 2014)). "An abuse of discretion 'arises when a decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

"Rule 4:9-1 requires that motions for leave to amend be granted liberally." Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 456 (1998) (citing Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 4:9-1 (1998)). This

is the case "even if the ultimate merits of the amendment are uncertain." G&W, Inc. v. Borough of E. Rutherford, 280 N.J. Super. 507, 516 (App. Div. 1995). A court must treat all the allegations in the pleadings as true. Webb v. Witt, 379 N.J. Super. 18, 28 (App. Div. 2005).

"While motions for leave to amend pleadings are to be liberally granted, they nonetheless are best left to the sound discretion of the trial court in light of the factual situation existing at the time each motion is made." Fisher v. Yates, 270 N.J. Super. 458, 467 (App. Div. 1994) (citing R. 4:9-1). "That exercise of discretion requires a two-step process: whether the non-moving party will be prejudiced, and whether granting the amendment would nonetheless be futile." Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006).

"The court determines whether the proposed amendment would be futile by asking 'whether the amended claim will nonetheless fail and, hence, allowing the amendment would be a useless endeavor.'" Grillo, 469 N.J. Super. at 275-76 (quoting Notte, 185 N.J. at 501). If it is clear an amendment is meritless and cannot withstand dismissal under Rule 4:6-2, it is not an abuse of discretion to deny the motion to amend. See Bustamante v. Borough of Paramus, 413 N.J. Super. 276, 298 (App. Div. 2010). The court may also consider "the reason for the late filing," whether an amendment would "cause undue delay of the trial, or

constitute an effort to avoid another applicable rule of law." Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 485 (App. Div. 2012) (citations omitted).

We review a trial judge's decision on whether to grant or deny a motion for rehearing or reconsideration for an abuse of discretion. JPC Merger Sub LLC v. Tricon Enters., Inc., 474 N.J. Super. 145, 160 (App. Div. 2022) (citing Pitney Bowes Bank, 440 N.J. Super. at 382). "Where the order sought to be reconsidered is interlocutory, as in this case, Rule 4:42-2 governs the motion." Ibid. Under that Rule, "interlocutory orders 'shall be subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of justice.'" Lawson v. Dewar, 468 N.J. Super. 128, 134 (App. Div. 2021) (quoting R. 4:42-2).

Fraudulent concealment is a cause of action specifically premised on the withholding of evidence. Rosenblit, 166 N.J. at 406-07; Viviano v. CBS, 251 N.J. Super. 113, 129-30 (App. Div. 1991). To prevail on a fraudulent concealment claim, a plaintiff must demonstrate:

> (1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;
>
> (2) That the evidence was material to the litigation;

(3) That plaintiff could not reasonably have obtained access to the evidence from another source;

(4) That defendant intentionally withheld, altered[,] or destroyed the evidence with purpose to disrupt the litigation; and

(5) That plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

[Rosenblit, 166 N.J. at 406-07.]

If these elements exist, then a plaintiff may invoke a fraudulent concealment claim "as a remedy for spoliation." Id. at 407.

Spoliation "occurs when evidence pertinent to the action is destroyed, thereby interfering with the action's proper administration and disposition." Cockerline v. Menendez, 411 N.J. Super. 596, 620 (App. Div. 2010) (quoting Aetna Life & Cas. Co. v. Imet Mason Contrs., 309 N.J. Super. 358, 364 (App. Div. 1998)). "[T]o a great extent our traditional approach to spoliation begins with identifying the spoliator, because that . . . will impact on the available and appropriate remedies." Robertet Flavors, Inc. v. Tri-Form Constr., Inc., 203 N.J. 252, 272 (2010) (citing Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 119-20 (2008)). When the spoliator is the defendant in the suit, the court is empowered to fashion an appropriate remedy. See Cockerline, 411 N.J. Super. at 620 ("Depending on the circumstances, spoliation can result in dismissal, a

16

separate tort action for fraudulent concealment, discovery sanctions, or an adverse trial inference against the party that caused the loss of evidence."). "The selection of the appropriate sanction is left to the trial court's discretion and will not be disturbed if it is 'just and reasonable in the circumstances.'" Id. at 620-21 (quoting Hirsch v. Gen. Motors Corp., 266 N.J. Super. 222, 260-61 (Law Div. 1993)).

As the Rosenblit Court explained:

> The best known civil remedy that has been developed is the so-called spoliation inference that comes into play where a litigant is made aware of the destruction or concealment of evidence during the underlying litigation. . . .
>
> Courts use the spoliation inference during the underlying litigation as a method of evening the playing field where evidence has been hidden or destroyed. It essentially allows a jury in the underlying case to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to [them].
>
> [166 N.J. at 401-02 (citations omitted).]

Applying the aforementioned legal principles, we are convinced the court did not abuse its discretion or otherwise err: in denying plaintiff's motion to amend the complaint; rejecting plaintiff's request for a spoliation inference; and subsequently denying plaintiff's motion for reconsideration. As to the first and

17

third factors, we do not discern that defendants dispute their legal obligation to disclose the TMS logs had they not been automatically deleted, nor do they contend plaintiff could have received the TMS logs from another source. With respect to the second factor, however, plaintiff failed to demonstrate how the TMS logs were relevant.

Although plaintiff avers in its proposed amended complaint the TMS logs were "material to the underlying litigation in that . . . plaintiff alleges that the [TMS] software failed to operate properly in controlling the level of ceiling lights," there is no evidence in the record the TMS logs would have revealed whether the lighting schedule operated properly. Indeed, the facts before the court at the time show the TMS logs did not contain any pertinent information, and plaintiff had already received through discovery the security log, performance log, and event log from DCIP.

As to the fourth factor, even viewing plaintiffs' claim with liberality, there is no support that defendants intentionally destroyed the TMS logs with the purpose to disrupt the litigation. According to the Hart affidavit, the individual directly responsible for defendants' technical operations, "the TMS software automatically deletes the logs after eight days." Additionally, within that eight-day timeframe, the only potential notice of litigation defendants possessed was

18

the guest incident report, which failed to describe in any detail the cause of plaintiff's alleged incident. Therefore, defendants would have had no reason to preserve the TMS logs.

Even if plaintiff's assertion the TMS logs are preserved for three weeks is correct, despite the fact this information came from an employee who was not directly involved in maintaining the TMS logs and who qualified her answer by stating it was an estimate, the September 1 letter was not sent until nineteen days after the alleged incident. It would be unreasonable to assume defendants received the letter within two days, providing them with sufficient time to preserve the TMS logs. Additionally, we note neither the guest incident report nor the September 1 letter ascribed the cause of Joan's fall to inadequate lighting in the theater.

Plaintiff also failed to satisfy the fifth factor. In the proposed amended complaint, plaintiff stated it suffered damages by having to pay a software expert to review the logs provided by DCIP and "the logs provided by defendant[s] . . . to DCIP for permanent storage do not record errors involving the automatic operation of the ceiling lighting." Plaintiff's claim it had to pay a software expert as a result of defendants alleged fraudulent concealment is wholly without merit. If, as plaintiff asserts, the core aspect of its case was the failure of automatic

19

systems to function properly, it would have had to hire an expert regardless of whether it received the TMS logs.

Additionally, as noted, there is no evidence in the record that even suggests the TMS logs contained information regarding whether the lighting systems functioned properly. According to the Hart affidavit, the TMS "is a scheduling system that is primarily concerned with whether the schedule got created as opposed to accurately showing that the equipment did what was asked." Plaintiff did not offer any competent evidence rebutting this assertion and, indeed, received the logs, which contained the information it supposedly sought. As such, we are unconvinced plaintiff suffered any prejudice because of defendants' failure to preserve the TMS logs. Thus, the court properly denied plaintiff's application to amend the complaint because it would have been futile.

With respect to plaintiff's request for a spoliation inference, the court appropriately denied that application as well. Simply put, plaintiff failed to demonstrate defendants intentionally destroyed the TMS logs or establish how they would have been relevant to the litigation.

Finally, plaintiff's argument the court erred by considering materials outside the pleadings contrary to Printing Mart is unavailing. 116 N.J. 739. As noted, a motion for leave to amend a complaint is governed by the same standard

as a motion to dismiss under Rule 4:6-2(e). Interchange State Bank, 303 N.J. Super. at 257. Under Rule 4:6-2(e), a party may essentially convert the motion to a summary judgment application by relying on "matters outside the pleading[s]." See R. 4:6-2 (stating if a party on a Rule 4:6-2(e) motion to dismiss relies on "matters outside the pleading[s,]" the motion "shall be treated as one for summary judgment and disposed of as provided by R[ule] 4:46, and [that] all parties . . . be given . . . reasonable opportunity to present all material pertinent to such a motion"); see also Cnty. of Warren v. State, 409 N.J. Super. 495, 504 (App. Div. 2009).

Here, it was plaintiff, not defendants, who relied on materials outside the pleadings. For example, in support of its motion, plaintiff appended copies of: defendants' answers to plaintiff's requests for admissions; defendants' answers to plaintiff's first and second set of supplemental interrogatories; excerpts from the depositions of Charles, Joan, Puff, Patel, Owens, and Higgins; time-stamped movie tickets; the guest incident report; Owens' incident report; defendants' operation incident reporting manual; and the September 1 letter. Thus, because plaintiff relied on materials outside the pleadings in support of its motion to amend the complaint, the court did not err in considering those and defendants'

materials. Plaintiff was provided with more than a sufficient opportunity to address and rebut defendants' opposing proofs.

To the extent we have not addressed any of plaintiff's remaining arguments, it is because we have concluded that they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0806-23